PHILLIP A. DETHLOFF *et al.*, Plaintiffs-Appellees and Cross-Appellants, *v.* ZEIGLER COAL COMPANY, Defendant-Appellant and Cross-Appellee.

Fourth District   No. 15024

Opinion filed February 28, 1979.—Supplemental opinion filed on denial of rehearing March 30, 1979.

John H. Armstrong, Paul R. Lynch, and Richard F. Record, Jr., all of Craig & Craig, of Mattoon (James B. Rice and Arthur R. O'Brien, of counsel), for appellant.

Harold A. Baker, of Hatch & Baker, of Champaign, and Raymond Lee, of Tuscola, for appellees.

Mr. JUSTICE MILLS delivered the opinion of the court:

Coal lease.

Verdict for plaintiffs: $4,019,867.08.

We affirm upon remittitur to $1,573,455.57. Otherwise, we reverse and remand for a new trial.

This will be a long opinion. The facts are prolix and complex, but their tiresome recitation is requisite to a hopefully lucid discussion of the substantial issues before us on appeal.

On June 20, 1945, the Dethloffs' predecessors in title executed a mining lease in favor of Zeigler's predecessors in title. The lease covered a 40-acre tract located in Douglas County, Illinois, and by its terms, pertained to "all of the coal lying in or under" that property. Plaintiffs acquired their title to the property as joint tenants on October 18, 1969, for a payment of $20,000, and it is agreed by the parties that the mining

lease was in full force and effect at least until the time of the conveyance of October 18, 1969. Through various mergers and name changes, Zeigler is the present lessee.

The Dethloffs sued Zeigler as follows: Count I sought compensatory damages for a trespassory taking of coal commencing on or about January 10, 1976; count II asked for punitive damages for the trespass based upon the alleged wilful, malicious and deliberate actions of Zeigler; count III prayed for a declaration that the mining lease expired by its own terms solely because there had been no mining or removal of coal from the premises by Zeigler prior to June 20, 1970 (which was 25 years after the lease was executed). Zeigler's answer denied the material allegations and asserted the affirmative defenses of laches and unreasonable delay, estoppel and accord and satisfaction.

A hearing before the circuit court on count III (terms of the lease) was held on September 14, 1977. It was established that Zeigler's mining operations commenced on the leased property in January 1976. Mr. Dethloff testified that at the time of acquisition of the property he knew of the existence of the mining lease and was aware of the terms of the lease. Sometime in 1971, plaintiffs' attorneys commenced correspondence and negotiation with the defendant respecting the lease in question and in July of that year H. E. Wenninger, general mine manager, was directed to contact plaintiffs' attorneys. In approximately May 1975, Dethloff went to Zeigler's Murdock, Illinois, offices where he learned from an employee of defendant that within perhaps a year mining operations would be commenced under plaintiffs' land. Dethloff then recontacted one of his attorneys. An advance royalty payment and a transmittal letter (bearing date of March 25, 1976) from defendant were received by plaintiff and placed in his lock box, since he considered them to be evidence of mining a certain quantity of coal. He did not cash the check. Other similar checks and transmittal letters reflecting production of coal by defendant from the land in question were subsequently received by Dethloff and similarly handled.

George P. Latchford III (called by plaintiffs under section 60) testified that he had been a licensed attorney in Illinois since 1955 and was senior vice president of finance and general counsel for Zeigler, a position that he had held since about May 1973. He knew on June 2, 1975, that plaintiffs had taken the position (as early as 1973) that the mining lease had previously expired and he was still of the opinion, as he was in 1972, that the defendant should proceed under the lease and he intended to recommend to defendant to go forward with mining operations. He said that the first time coal was mined under plaintiffs' property was in January 1976, and the first royalty check was March 25, 1976. He allowed as how the royalty check and transmittal letter were probably the first notice to

the plaintiffs that coal was in fact being mined. Zeigler continued its mining operations under plaintiffs' land, notwithstanding receipt of the original of plaintiffs' exhibits 13-16, and notwithstanding receipt of papers commencing the present litigation. Plaintiffs' exhibit 15 is an opinion of counsel relating to the mining lease in question rendered on or about November 30, 1973, to defendant.

On direct, Latchford testified that Zeigler has never received from plaintiffs a copy of their deed of conveyance and received no instructions subsequent to 1969 with respect to payment or the depositing of advance royalties or delayed rentals; that the coal mine (of which the underground portion of plaintiffs' land formed a part) is approximately 200 feet below the surface, deploys four operating units or four separate sets of equipment and is equipped to wash coal; that modern equipment is used and underground haulage is accomplished by electrically driven belts; that the coal is raised to the surface by the same method as a slope belt; that the production capacity of the mine is about 1,500,000 tons per year; that there are at least 5,000-6,000 acres of ground under lease as part of the mining operation; that many acres under lease are necessary to economically justify investment in a mine; and that obtaining mining leases was relied upon prior to initial installation of the mine. (There was an offer of proof that large sums of money had been invested in the mine, that approximately 350 people are employed at the Murdock Mine, and that several miles of mining corridors were present in the mine, but the circuit court rejected the offer.)

The circuit court opined that there was no ground for legal action by plaintiffs until the knowledge of the alleged trespass was known and that he saw no laches or estoppel. His written order declared that the lease expired by its own terms on June 20, 1970, at the end of 25 years. Defendant filed a motion for rehearing and to vacate the judgment, and plaintiffs filed a motion to strike. Defendant, over objection of plaintiffs, presented testimony by offers of proof (a chief mining engineer, a mining expert, and an accountant), which were rejected by the circuit court. Motion for rehearing was denied and the trial judge sent a letter to counsel of record setting forth the reasons for his rulings. In that memorandum he indicated that the "basic problem" presented in count III was "the meaning" of the clause referring to a specific 25-year term, stated that under Illinois law there is an implied covenant to produce within a reasonable time, found that the language in the instant mining lease was almost identical to language used in standard oil and gas leases, and held that: "I believe this clause has universally been construed to grant the right to produce within the stated term and to continue production for so long as there is any oil. If production is not attempted on the premises within the term, the lease expires."

Thereafter, Zeigler moved to transfer venue of the case to Piatt County and for summary judgment on count II (punitive damages). Over 200 affidavits in support of the petition for transfer of venue were filed by Zeigler, and plaintiffs filed six affidavits in opposition. The circuit court denied transfer of venue and allowed summary judgment on count II.

The cause went to jury trial on count I (compensation for trespassory taking of coal). In chambers prior to voir dire the Dethloffs argued their motion to strike Zeigler's affirmative defenses (laches, estoppel, accord and satisfaction) which—over objection—the circuit court allowed. In the course of the argument on plaintiffs' motion in limine (which would exclude defendant's evidence of good faith), they moved to amend by omitting language from count I reading "* * * knowingly, wantonly and wilfully, and with force and arms," and there being no objection by defendant, it was allowed. The operative language of count I was reduced to "Defendant * * * broke and entered said vein of coal * * *." The trial judge ruled that once the plaintiffs had communicated to defendant a claim that the lease had expired, any mining thereafter could not be in good faith, and the question of whether there was good faith or not was not for the jury, but for the court. The motion in limine was allowed. (The motion for change of venue was renewed, but again denied.)

Upon trial, the evidence may be compressed and summarized like this:

GEORGE SEAMAN (surveyor for Zeigler): testified as to measuring the quantity of coal taken; coal is weighed when sold or shipped; it is possible for the amount of coal mined to be computed from the figures he recorded in field book #6.

ROBERT HINKLE (mine superintendent): all coal goes through a rotary breaker for sizing and discharge of impurities; some is crushed, some washed; raw coal is coal that has gone through the breaker and the crusher.

THOMAS G. CORMAN (vice president and comptroller of Zeigler): testified as to sales prices realized by defendant; an average sales figure of $19.88 per ton; this is determined by dividing the total dollars realized by defendant by the tons sold to arrive at an average price; the figure is an "arithmetical" average of the number of contract prices, divided by the number of customers; the figure is also stated as $19.33.

(Over objection, Zeigler's answer to a written interrogatory was read to the jury: The cost of loading and hauling coal from the place where mined to the foot of the shaft is $1.038 per ton.)

ROY HELFINSTINE (head of the Mineral Section, Illinois State Geological Survey—over objection, read from the evidence deposition): Two exhibits are part of sulphur reduction of Illinois coal washability

studies; Part I refers to samples taken from 1967 to 1969, including samples from the Murdock Mine; washability tests were made under his supervision and direction.

GEORGE EADIE (mining engineer and professor): by his calculations, 5,610,030 cubic feet of coal had been removed from plaintiffs' property; coal has a weight of 85 pounds per cubic foot; cubic footage multiplied by weight gives 238,426 tons as the amount of coal removed; this is untreated, raw coal; figures are subject to a margin of error of 1.5%. (He apparently bases the weight figure on the tests run under Helfinstine's direction.)

Plaintiffs rested. Defendant's motion for directed verdict was denied.

CLAYTON SLACK (vice president for engineering of Zeigler): the marketable tonnage extracted from plaintiffs' tract was 215,247.40 tons.

THOMAS G. CORMAN (comptroller): by offer of proof, attempted to show Zeigler's costs of mining. (The evidence was excluded.)

GEORGE P. LATCHFORD (corporate counsel): evidence of the good faith nature of Zeigler's actions; he was aware of a potential dispute over the lease before 1973; the lease was examined by a "land lawyer" employed by Zeigler, by Latchford himself, and by outside counsel; all three concluded that the lease was valid and would continue beyond 25 years; corporate records show royalty payments to the Dethloffs; a similar suit was brought in Douglas County in 1974 but was dismissed; no payment was made to that claimant by defendant; the Dethloff coal either had to be mined sequentially by Zeigler or not at all, because once having passed, the engineering people advised that they could not go back for it.

MACK H. SHUMATE (offer of proof): only way for plaintiffs' parcel to have been mined was for defendant to mine it; exploration showed that the coal was thin, with a bad roof, and was questionable.

HAROLD E. WENNINGER (general mine manager): in 1976 the royalty offered for coal leases was 15 cents per ton.

SCOTT L. ROGERS (vice president of marketing for Zeigler): offer of proof; all of the Murdock Mine product for 1976 was sold; all was prepared to some extent; none was sold from the mouth of the mine; coal, as it was at the mouth of mine, could not be marketed.

ELMER C. HILL (coal broker): offer of proof; coal as it was at the mouth would not be marketable, unless a steam electric plant was located very near the mine.

CHARLES LINKE (an economist and professor): offer of proof; he was familiar with measurement of losses from an economic standpoint; legal rules are not always consistent with economic reality; he measured plaintiffs' loss as worth 15 cents per ton.

The jury returned a verdict for plaintiffs of $4,019,867.08 and judgment was entered accordingly. Defendant appeals from the

declaratory judgment (count III) and the jury's money judgment (count I), and plaintiffs' cross-appeal the summary judgment (count II).

## TERM OF THE LEASE

The cardinal issue in this appeal pivots on the construction of the habendum clause of the Dethloff-Zeigler Coal Company lease:

> "This lease shall be and continue for the term of 25 years from and after the date hereof, and for so long thereafter as shall in the opinion of lessee to be necessary to mine and remove all of the coal in and under the above described leased land and other lands in the vicinity thereof, or included in the block of leased coal hereinafter referred to, unless the lease is sooner terminated as hereinafter provided and unless in the opinion of the lessee the coal which can be economically mined in accordance with good and accepted mining practices from said lands shall be sooner exhausted. It is expressly agreed, however, that the rents and royalties hereinafter provided for shall not be payable after such coal in and under the above described real estate hereby leased cannot be economically mined, as aforesaid. But the right to remove coal and other materials from other lands through any underground ways and entries in said above described leased lands, which rights are hereby expressly granted, shall continue, as an extension of this lease, free of rents and royalties as long as the lessee shall desire to have or use the same, even though all coal economically and practically minable shall have been mined and removed from the above described leased lands, even though the said term of 25 years shall have expired."

The trial court's declaratory judgment held that the lease had terminated by its own terms on June 20, 1970. As already noted, the trial judge held that under Illinois law there is an implied covenant to produce within a reasonable time, and if production is not attempted on the premises within the term, the lease expires.

### A. SELF-EXECUTING EXTENSION CLAUSE?

Production of coal from plaintiffs' land occurred 31 years after the lease was executed. Defendant urges this court to construe this lease as a freehold, contending that by mining in the "vicinity" of plaintiffs' premises within the 25-year term, it has complied with the implied covenant to produce. Plaintiffs, however, contend an estate on special limitation was granted, which expired by its own terms on June 20, 1970.

Plaintiffs cite to us the Oregon case of *Fremont Lumber Co. v. Starrell Petroleum Co.* (1961), 228 Ore. 180, 364 P.2d 773. The mineral lease involved there had a term " * * * for * * * 5 years * * * and as

long thereafter as oil, gas or other mineral is produced from said land * * *.' " (228 Ore. 180, 186, 364 P.2d 773, 776.) The defendant-lessee argued that the thereafter clause was a condition subsequent which required notice before the lease would terminate. Agreeing with plaintiff-lessor, however, the court found it to be a 5-year lease on special limitation, with the incident of automatic termination at the end of the primary term unless production was occurring at that time.

The *Fremont* case, incidentally, contains an excellent discussion of the similarities between mining and oil and gas leases, as well as a lucid review of "unless" leases, special limitations, conditions subsequent, "drill or pay" provisions, primary terms and indefinite terms, "thereafter" clauses, and the legal meaning of "mine" and "mining."

The Supreme Court of Pennsylvania in *Pape v. Hughes* (1960), 398 Pa. 436, 158 A.2d 547, interpreted a lease which provided for:

> "* * * the sole and exclusive right and privilege of mining, removing and marketing of minerals and material, including gravel, sand, clays, stone and ore * * * for a period of 5 years, 'and for such additional longer period as the hereinbefore mentioned minerals and materials may be found on the premises * * * in sufficient quantity as to be profitable commercially to remove, the duration of said extended period to be determined by the' grantee." 398 Pa. 436, 437, 158 A.2d 547, 548.

In the landowner-lessor's action to quiet title, the Pennsylvania court found as a matter of fact that at the end of the 5-year period specified in the lease, minerals were not found on the premises in sufficient quantity to be removed profitably and that the lease expired at the end of the 5-year period. The condition upon which the lease was to be extended beyond the initial 5-year period was that a commercially profitable quantity of minerals be found and that that condition exist at the end of the 5-year base term.

A similar analysis was applied by this court in *Metz v. Doss* (1969), 114 Ill. App. 2d 195, 252 N.E.2d 410. The lease, dated July 29, 1956, provided for a primary term of 1 year and as long thereafter as oil or gas or either of them is produced from said land by lessee. A well was drilled within the primary term and gas was encountered, but there was no commercial production of gas from the lease at any time. Lessees then attempted to develop the area as a gas storage reservoir. Under the terms of the lease, lessor was entitled to have the lease terminate at the end of the primary term unless there was production. Plaintiff-lessor sought a release of record of an oil and gas lease, and the trial court granted plaintiff summary judgment.

An oil and gas lease was also involved in *Morris v. Mayden* (1976), 35 Ill. App. 3d 338, 340, 341 N.E.2d 428, 429. Plaintiffs owned an executory

interest in one-half of the oil, gas, and other minerals beneath property they owned in fee that was to become possessory upon the termination of the oil and gas lease between defendant Mayden and the Pure Oil Company. The lease, executed in April 1936, was to "* * * remain in force for a term of 10 years from this date, and as long thereafter as oil or gas or either of them is produced from said land by lessee." In the absence of any allegation that production had ceased from such land, the trial court dismissed on the ground that plaintiffs failed to show a present interest in the oil and gas.

■■ The distinction of an estate on *condition subsequent* (urged by defendant) and an estate on *special limitation* (argued by plaintiffs) is primarily the requirement of notice. While an estate on limitation will terminate *automatically*, an estate on condition subsequent continues until *notice* that the conditions will be enforced. Zeigler argues that the Dethloffs' failure to provide notice of termination as provided in the lease leads to the conclusion that the lease was in full force and effect at the time of production. However, the notice provisions in the lease are in reference to default or breach on the part of defendant. Plaintiffs' action for declaratory judgment was not premised on default or breach—it was based on the expiration of the lease by its own terms.

The Dethloffs refer this court to the recent case of *Shannon v. Stookey* (1978), 59 Ill. App. 3d 573, 375 N.E.2d 881, in further support of their position. Shannon brought an action alleging abandonment of an oil and gas lease and the equipment thereon. The Shannon lease was executed January 9, 1974, and was extended to run until July 23, 1974, or as long thereafter as oil and gas was produced. The evidence was undisputed that during the primary term, no oil or gas had ever been produced. The court pointed out that the lease had expired under its own terms prior to the alleged abandonment.

The special limitation construction concept found in *Fremont* and urged by plaintiffs is somewhat confusing since limitations traditionally cut short estates in land rather than extend such estates. Although the effect is essentially the same, the limitation terminology does not appeal to us and we purposefully avoid it.

■■ The analysis, however, applied in interpreting the habendum clauses of the mineral leases in *Fremont, Pape, Metz* and *Morris* stand for sound and solid reasoning, and we believe it to represent the correct yardstick by which to measure the lease before us. In 1945, the original parties entered into a coal lease for a primary term of 25 years. If, at the end of this term, coal had been found on the premises and the lessee considered it profitable to commence production, the lease was to be automatically extended by the "thereafter" clause. If, however, the 25-year period ended and there was no ongoing production at that time, the lease terminated by

its own terms. (This construction does not require a court to imply a covenant on the part of lessees to produce in a reasonable time, as the trial judge did here.) Since there was no production of coal from plaintiffs' land at the end of the primary term, the lease terminated June 20, 1970.

B. CONVEYANCE (FREEHOLD) OR LEASE?

But Zeigler contends that the lease creates a freehold estate and acts as a conveyance of the minerals. Since an estate for years is a nonfreehold estate, a classification of this instrument as a freehold would, of course, render the trial court's interpretation erroneous.

In *Fowler v. Marion & Pittsburg Coal Co.* (1924), 315 Ill. 312, 146 N.E. 318, an instrument that conveyed authority to mine all the coal contained in or under the property was held to pass a freehold estate because the lessee was given the unlimited right to go upon the land and mine for coal. *Daughettee v. Ohio Oil Co.* (1914), 263 Ill. 518, 524, 105 N.E. 308, 310, found a lease "* * * for the term of five years, and as much longer as gas or oil is found in paying quantities * * *" to be a freehold for the reason that it may continue indefinitely. *Bruner v. Hicks* (1907), 230 Ill. 536, 537, 82 N.E. 888, 889, interpreted a lease "* * * of ten years or so long as oil and gas might be found on said premises * * *" as a freehold, requiring a release of homestead rights. However, in *Blue Bird Air Service, Inc. v. City of Chicago* (1941), 376 Ill. 272, 33 N.E.2d 456, interpreting a lease of hangar space at an airport, the court pointed out that a lease for any number of years is not a freehold.

In determining whether the instrument is a *conveyance* of minerals or *lease* of the minerals, the consideration paid to the lessors is relevant. Under the document here (entitled "MINING LEASE"), lessors were to receive $1 per acre "during the first year of the term," and then $2 per acre "at the end of the second year of *such term* and at the end of *each succeeding year thereof.*" The next sentence of the "MINING LEASE" provides that after Zeigler begins to mine coal from the "described leased lands, if at the end of any year of *such term*" no coal has been taken from the leased land, then $2 per acre shall be paid. Any rent paid to lessors was to be credited as advance royalty when production began and royalties became payable. (A royalty of five cents per ton was set forth.) After 1970, the Dethloffs received no compensation under the lease. Yet Zeigler attempted to pay plaintiffs royalties in 1976 when production began. We view this as highly significant and rather indicative of intent to treat our document as a lease.

■■ Furthermore, the granting clause itself indicates a lease. To construe this instrument as a conveyance of the coal renders the term of 25 years meaningless. And the parties to the instrument treated it as a lease: Defendant's predecessors assigned to Zeigler their rights under the lease and plaintiffs' predecessors conveyed the coal to the Dethloffs by specific

reference. As we read this lease, there is no provision whatever for the payment of rent after the end of the term where mining has not been commenced. We again conclude that this instrument should be construed as a lease for 25 years, with a self-executing extension clause at the end of the 25-year period if the condition of coal being produced is met.

## C. IMPLIED COVENANT TO PRODUCE?

The trial court found an implied covenant to produce within a reasonable time under Illinois law. Zeigler correctly contends there is no express covenant in the mining lease requiring that coal be mined from plaintiffs' land by any specified time. Defendant then argues that by mining coal in the "vicinity" of plaintiffs' premises or in the "block of coal" encompassing plaintiffs' premises within 25 years, it has complied with the implied covenant to produce during the primary term. This contention focuses on this portion of the habendum clause:

> "* * * and so long thereafter as shall in the opinion of Lessee be necessary to mine and remove all of the coal in and under the above described leased lands *and other lands in the vicinity thereof,* or included in the *block of leased coal hereinafter* referred to, * * *." (Emphasis ours.)

Rejecting this contention, the trial court observed that, reading the instrument as a whole, this phrase allowed Zeigler to carry coal mined in the vicinity through the empty passages in plaintiffs' land after the primary term was over.

When faced with the issue, courts have found an implied covenant to produce in mineral leases for a term of years with a thereafter clause. This recognizes that a lessor enters into a mineral lease with the purpose and expectation of receiving royalties. In *Stoddard v. Illinois Improvement & Ballast Co.* (1916), 275 Ill. 199, 200, 113 N.E. 913, 914, the lessor of a stone quarry sought damages based on the lessee's refusal to quarry. The lease was "* * * for a term of ten years, 'or as long thereafter as the property is suitable for quarrying purposes.' " The court found an implied covenant that the lessees would quarry stone with reasonable diligence if it was found and so long as it was found in a quantity and kind that could be quarried at a profit to the lessee. See also Annot., *Implied obligation of purchaser or lessee to conduct search for, or to develop or work premises for, minerals other than oil and gas,* 76 A.L.R.2d 721 (1961).

It occurs to us that both of the parties and the trial court have unduly emphasized the "implied covenant to produce" aspect of mineral leases. Zeigler argues that it has complied with its covenant to produce by mining in the vicinity and that this extends its right to mine coal from plaintiffs' premises. The Dethloffs argue that defendant's failure to mine from their land within the 25-year term terminates the lease. And the trial judge found an implied covenant to produce coal from plaintiffs'

premises. In our view, what the defendant lessee covenanted to do during the primary term is not at issue at all, and it is wholly unnecessary to imply a covenant to produce.

On the second page of the lease appears a paragraph that was marked through in pen and "VOID" was handwritten over the printed wording. That stricken paragraph spoke of the proposal to lease "coal in other lands" and "in a substantial block in which the above described leased lands will be included." This provision having been voided, we deem Zeigler's "vicinity" or "block of coal" assertion under the habendum clause as meaningless and the argument simply falls. At best, the terms "vicinity" and "block" are rendered so ambiguous as to afford no clear direction, definition or meaning in the context of this lease.

## MEASURE OF DAMAGES

The litigants dispute not only the measure of damages but also the character of the trespass. The remaining two major issues—measure of damages and good faith or wilful trespasser—are inexorably intertwined. They are interdependent and the former is actually determined by which latter category the defendant here qualifies for. *Lambach v. Town of Mason* (1944), 386 Ill. 41, 53 N.E.2d 601, discusses the measure of damages for the trespassory taking of oil and gas which we deem equally adaptable to cases dealing with the taking of coal. *Lambach* dealt with a trespasser who acted in "good faith" and the supreme court held that such a trespasser was entitled to a credit for the reasonable cost and expenses of drilling, completing, equipping and operating the well, and producing the oil, less the reasonable value of any of the equipment salvaged. (It is not stated in the opinion at what *point* in the production and distribution chain the value of the oil and gas to the owner was to be determined.)

*Lambach* relies on *Guffey v. Smith* (1915), 237 U.S. 101, 59 L. Ed. 856, 35 S. Ct. 526, a case that arose in Illinois, but was decided under the notions of a Federal common law. The defendants in *Guffey* were assignees under a lease and took their assignment without actual notice of a prior recorded lease that was held by complainants. They acted upon the advice of an abstractor who failed to make a proper examination of the record. With the lessor's approval, lessee-defendants drilled wells and developed oil. When advised of the prior lease and of the complainants' purpose to insist upon their rights and to obtain redress, defendants persisted in the drilling, production, and sale of oil. The supreme court held that damages for oil taken up to the point that defendants acquired actual notice of the prior lease were measurable by the value of the oil in the pipeline where sold, less cost of improvements and operations whereby oil was taken from the earth and delivered at the pipeline. The

damages for oil taken after actual notice was given, however, were indeed another matter. A distinction between a good faith and a wilful trespass is drawn from this reasoning from *Guffey*:

> "[T]he constructive notice resulting from the recording of the prior lease was not inconsistent with an honest, though mistaken, belief on their [defendants'] part that they had acquired a perfect right to take and dispose of the oil. But the expenses incurred after August 1, 1907, are upon a different footing. On that date Solley and his associates were actually and fully informed of the prior lease and of the complainants' purpose to insist upon the rights conferred by it and to obtain redress for the invasion of those rights, so what was done thereafter cannot be regarded as anything less than a wilful taking and appropriation of the oil which was subject to the complainants' superior right." (237 U.S. 101, 118-19, 59 L. Ed. 2d 856, 866, 35 S. Ct. 526, 531-32.)

Although not specifically expressed in the opinion, it seems the wilful trespasser receives no credit for his production efforts.

The annotation at 21 A.L.R.2d 380 (1952) sets out the general rules: Where the taking of coal is in *good faith*, the so-called mild rule applies. This is the value of the minerals *in situ*. Where such value cannot be ascertained, the measure is (1) the market royalty; (2) the value of minerals after extraction, less production costs. But if the taking is wilful, reckless, or intentional, or without claim of right or title, the trespasser is liable for the enhanced value of the product when and where it is finally converted to the trespasser's use, without any deduction for expenses incurred, or for any value he may have added to the mineral by his labor. (A.L.R. lists the jurisdictions stating this rule as the United States, Alaska, Arkansas, California, Indiana, Kentucky, Louisiana, Maryland, Michigan, Montana, New Mexico, Ohio, Oklahoma, Tennessee, Texas, Virginia, West Virginia, and Wyoming.)

As pointed out in the A.L.R. annotation, *Lambach* was a break with the established Illinois precedent. Our review of the cases leads us to conclude that the measure of damages, without regard to the character of the trespass, had been the value of the coal at the mouth of the pit, less the cost of conveying the coal from the place where dug to the mouth, but not allowing credit for mining and digging. The seminal case appears to be *Robertson v. Jones* (1874), 71 Ill. 405. There, the question presented for review was the correct measure of damages and the court said this:

> "[I]n an action of trespass, he has the right to recover the value of the coal after it is dug in the bank; or, he could recover the value of the coal at the mouth of the pit, less the cost of conveying it, after dug, from the mine to the mouth of the pit." 71 Ill. 405, 407.

Thirty some years later, in the case of *McGuire v. Boyd Coal & Coke Co.* (1908), 236 Ill. 69, 86 N.E. 174, there was a knowing and intentional taking of coal. The parties (and the supreme court) agreed that the measure of damages was the value of the coal at the mouth of the pit, less the cost of conveying it there from the place where mined. Defendant argued that its costs should include all work connected with the production of the coal, except the actual cost of separating it from its natural position by the miner, and costs of constructing the mine, sinking the shaft, and of permanent structures. The supreme court held that the trespasser was not entitled to the additional costs. (However, it does appear that the defendant was allowed a deduction for impurities extracted from the mined coal. Here, Zeigler argues for such a deduction also.)

A variation on this measure is found in *Smothers v. Cosgrove-Meehan Coal Co.* (1932), 264 Ill. App. 488. There, the value of the coal to the owner was established as its market value f.o.b. the mine. The trespasser was entitled to its costs of loading the coal upon cars, in addition to the costs of transporting it to the mouth of the pit. This rule had earlier been applied in *Donovan v. Consolidated Coal Co.* (1900), 187 Ill. 28, 58 N.E. 290.

It can readily be seen that we can value the coal at any point in the marketing chain, so long as we give credit to the trespasser for transporting it there. This springs from the notion that we cannot value something without an appropriate market; and to speak of value without a market is impossible, at least as far as this case is concerned. Zeigler argues that the measure of damages should be determined under the royalty method. This method gives the wronged owner only the royalty for coal prevailing in his field or vicinity. In our case, Zeigler's testimony is that this would be 15 cents per ton. Other jurisdictions have used this method, especially when the owner was not developing the mineral himself. However, this method of valuation finds no support in Illinois law.

■ We conclude that *Lambach* changed the law of damages recoverable from a *good faith* trespasser to conform to the general rule: That is, the good faith trespasser is allowed to deduct his production costs from the value of the coal as measured at the mouth of the pit.

(Since the trespasser in *Lambach* was held to be in good faith, we cannot say that the rule as to wilful trespassers has been brought into conformity with the general rule. The old Illinois rule treats a wilful trespasser more leniently than does the general rule. In Illinois, the wilful trespasser receives credit for the costs of moving the coal to the pit mouth, or other place. Under the general rule, the wilful trespasser receives no such credit.)

## GOOD FAITH OR WILFUL TRESPASSER

This issue arose when the Dethloffs presented a motion *in limine* to preclude evidence on Zeigler's cost of operation of the mine; on the cost, purchase price, or consideration for the plaintiffs' property; on payments made or tendered to the plaintiffs or their predecessors by the defendant; and on the provisions of the lease which formerly existed. The trial court granted the motion, making clear that it was ruling as a matter of law that defendant could not show its good faith.

There is no national consensus as to what constitutes good faith in this context. And the Illinois cases seem reluctant to adjudge a trespasser in good faith.

In *Donovan v. Consolidated Coal Co.* (1900), 187 Ill. 28, 58 N.E. 290, the issue of good faith was presented by appellant, who owned a tract with a coal mine. He also owned the surface of an adjoining tract, but appellee owned the coal under the surface. Appellant entered into a lease, granting the right to mine the coal under both tracts. Appellant's sublessee mined appellee's coal, and an action was brought for trespass. The supreme court held the appellant was liable for the trespass. The measure of damages was found to be the full value of the coal at the mouth of the pit less the cost of transporting it from the place where it was dug to the mouth, and if it was loaded upon railroad cars, less the loading costs.

Appellant argued that this measure was not applicable to the case because it was not a wilful trespasser, and that the proper measure would be the value of the coal as it was before it was mined. Appellant pointed to the evidence that he had never had possession of appellee's coal, and never claimed title to it; that he had a large plat in his office; that in making the contract he failed to remember that the coal had been sold to plaintiff; that he could give no other explanation of his contract; and never intended to dispose of the plaintiff's coal.

The supreme court rejected appellant's argument, holding that negligence or innocent mistake on the part of the trespasser does not bring him within the good faith rule.

As noted under the preceding issue, *Lambach* adopted *Guffey v. Smith* (1915), 237 U.S. 101, 59 L. Ed. 856, 35 S. Ct. 526, as stating the distinction between the two classes of trespassers. Under *Guffey*, a good faith trespasser apparently must have an honest, *though mistaken*, belief that he has acquired a perfect right to take and dispose of the mineral. One may become a wilful trespasser by proceeding in the face of actual notice of an adverse claim.

Good faith has been defined as something more than the trespasser's assertion of a colorable claim to the minerals. (*United States v. Wyoming* (1947), 331 U.S. 440, 91 L. Ed. 1590, 67 S. Ct. 1319, *rehearing denied* (1947), 332 U.S. 787, 92 L. Ed. 370, 68 S. Ct. 37.) Good faith requires that

the taking be without culpable negligence or a wilful disregard of the rights of others and in the honest and reasonable belief that it was rightful. (*Miller v. Tidal Oil Co.* (1932), 161 Okla. 155, 17 P.2d 967.) The Kentucky Supreme Court has listed four factors to be considered as evidencing good faith:

(1) At least reasonable doubt of the other party's exclusive or dominant right;

(2) That the trespasser acted upon advice of reputable counsel;

(3) That a court of competent jurisdiction had rendered a favorable judgment upon identical or similar issues;

(4) Whether delay would endanger loss, and urgent action would seem to be called for, recognizing that a distinction is to be made between land producing mineral ores and land producing fugacious minerals (oil). *Swiss Oil Corp. v. Hupp* (1934), 253 Ky. 552, 69 S.W.2d 1037.

That court also noted that the test of good faith is not the trespasser's violation of the law in light of the maxim that every man knows the law, but is his sincerity and his actual intention at the time. And the Kentucky Supreme Court has also said that the mere fact of notice of an adverse claim (or even the pendency of a suit asserting an adverse claim) would not be conclusive on the question that a claimant had not acted in good faith, because he might honestly be of the opinion that his contention was right. *Loeb v. Conley* (1914), 160 Ky. 91, 169 S.W. 575.

The facts relied on by Zeigler to justify its trespass are that it acted under the lease, that its own officers and independent counsel considered their title to be good, and that their development of the coal was economically necessary. But on the other side of the coin, defendant had some five or six years after receiving notice of plaintiffs' adverse claim during which it could have obtained a declaration of rights under the lease. The question of good faith here was a very crucial issue and—in our view—a factual determination too illusive to be decided as a matter of law. We conclude that the trial court was unwarranted in invading the jury's domain.

## POTPOURRI
### A. VENUE

Turning now to the lesser issues, Zeigler argues that its motion for change of venue was improperly denied because it could not receive a fair trial in Douglas County. Defendant points to its 200-plus affidavits and says that reasons for prejudice are clear from local newspaper coverage regarding rulings of the circuit court, the fact that in prior years defendant and some county residents had disputes over consideration for leasing rights, and that there had been efforts to organize residents of the county to negotiate lease rights with defendant.

Since the venue question was presented after plaintiffs' declaratory relief was granted, it comes too late. Section 3 of the venue act (Ill. Rev. Stat. 1975, ch. 146, par. 3; now Ill. Rev. Stat. 1977, ch. 110, par. 503) provides:

> "*Every application* for a change of venue by a party or his attorney shall be by petition, setting forth the cause of the application and praying a change of venue, which petition shall be verified by the affidavit of the applicant. A petition for change of venue shall not be granted unless it is presented before trial or hearing begins and before the judge to whom it is presented has ruled on any substantial issue in the case, provided that if any grounds for such change of venue occurs thereafter, a petition for change of venue may be presented based upon such grounds." (Emphasis added.)

In *Gilliland v. Board of Education* (1977), 67 Ill. 2d 143, 365 N.E.2d 322, a petition for change of venue was filed after the trial judge had ruled on a motion to dismiss the complaint. The supreme court held that denial of the late petition for change of venue was proper, and cited section 3 of the venue act.

In *Gilliland,* the prejudice alleged was that of a judge. In our case, the inhabitants of the county are said to be biased. However, the language of section 3 refers to "[e]very application." Furthermore, section 1 provides in part:

> "A change of venue in any civil action may be had in the following situations:
>
>       ❋ ❋ ❋
>
> (2) Where any party or his attorney fears that he will not receive a fair trial in the court in which the action is pending, *because the inhabitants of the county are or the judge is prejudiced* against him, or his attorney, or the adverse party has an undue influence over the minds of the inhabitants. In any such situation the venue shall not be changed except upon application, as provided in this Act, or by consent of the parties." (Emphasis added.) Ill. Rev. Stat. 1977, ch. 110, par. 501.

In reading section 3 together with section 1(2), it is clear that "[e]very application" is intended to cover applications alleging the prejudice of the inhabitants as well as those alleging the prejudice of the judge. The reason for the rule requiring an early filing of the application is the need for the orderly and efficient administration of trials. We perceive that the legislature intended, by means of section 3, to require that any application for change of venue be before the trial judge early in the proceedings so as to permit a proper scheduling of the case. Any other reading of section

3 would permit its use as a weapon for the dilatory litigant, and we do not see this as the purpose intended.

■ Our holding on the venue issue is that an application for change of venue premised upon the prejudice of the inhabitants of a county is not timely filed if the trial or hearing begins and the judge has ruled on any substantial issue.

We find that there is an alternate basis for affirming the trial judge on this issue.

■ There was extensive voir dire examination in the case at bench and the trial court granted defendant extra peremptory challenges. We especially note that Zeigler used only seven of its eight peremptory challenges. *Corbetta Construction Co. v. Lake County Public Building Com.* (1978), 64 Ill. App. 3d 313, 381 N.E.2d 758, holds that where a party does not exhaust peremptory challenges while seeking jurors acceptable to it, there is no abuse of discretion in denying a petition for change of venue.

The trial court heard the voir dire examination, and found no prejudice existing in the jurors who were selected. This court should not reverse unless the trial court abused its discretion. *Gouker v. Winnebago County Board of Supervisors* (1967), 37 Ill. 2d 473, 228 N.E.2d 881.

No abuse of discretion shown.

## B. EVIDENTIARY RULINGS

Defendant turns our attention now from the larger issues to the smaller.

■ First, error is claimed because during opening argument Dethloffs' attorney commented that the sale price for coal at the mine approached $20 per ton. Defendant attacks not the $20 figure, but the reference to a sales price. Zeigler contends that the possible measures of value are value of the coal at the mouth of the pit, or leasehold value, or profit and loss experience of defendant. We see no error in assuming that the value of coal taken by a trespasser is the price obtained by the trespasser for that coal at the mine, less the credits allowed by law, which is essentially what counsel was saying. No error.

■ Defendant next claims error because Zeigler's computer printout of its business records showing prices received for coal from the mine was received in evidence. The objection at trial was that the price was not shown to be the price at the mouth of the pit. This exhibit was described by Mr. Corman, Zeigler's vice president and comptroller, as a 12-page sales register for the Murdock Mine, one for each month of calendar year 1976. It shows total tonnage sold and the total charge to customers, monthly tonnage and charges, differentiates between raw and washed coal, and shows a current or prevailing price figure. This was a relevant exhibit. No error.

■ Defendant objects to admission of the deposition of Helfinstine which concerned tests made under his supervision and control in 1967 and 1968 and which established the specific gravity of coal from the Murdock Mine. Defendant's specific objection at trial was that the tests were not shown to have been made under Helfinstine's supervision and control. The trial court ruled that while some tests were not so performed, the deposition showed that the tests at issue were made under his supervision and control. The record also discloses that Helfinstine was a public official and that the records were maintained in connection with his duties. The evidence was properly admitted. *People ex rel. Wenzel v. Chicago & North Western Ry. Co.* (1963), 28 Ill. 2d 205, 190 N.E.2d 780.

Next, defendant alleges that the trial court should have precluded plaintiffs' impeachment of witness Corman. Mr. Corman testified on direct examination that the cost of loading and hauling coal to the mouth of the mine was $1.317 per ton. On cross-examination, plaintiffs' counsel read from a deposition where Corman had given the cost as $1.038 per ton. He said at trial that the $1.317 figure includes costs for a conveyor, but that the $1.038 figure did not. However, the answer given by Corman in the deposition, that costs were $1.038, includes the cost of the conveyor. The deposition was impeaching. No error.

### C. PRECLUDED EVIDENCE OF VALUE

The coal company was precluded from offering testimony of witnesses Hill and Rogers as to the crushing and washing of coal after it reached the mouth of the mine, but before it went to customers. Rogers said that in his expert opinion the coal would have no value at the mouth of the mine to its customers before it passed through a crusher.

■■ Although we disagree with such view that the coal had no value at the mouth of the mine, we likewise disagree with the Dethloffs that Zeigler is not entitled to credit for enhancement of the coal. Economic reality tells us that no one is standing at the mouth of the mine seeking to purchase the coal. Therefore, there is no market at that point and we are unable to assign a value to the coal. As we have heretofore pointed out, the measure of damages is for value *in situ*, but since we can't measure value there, courts have hit upon evaluating at the mouth of the mine. (If ever coal was marketed from the mouth, it is no longer.) Accordingly, defendant should recover cost for loading and hauling to the mouth, as has always been allowed. In addition, defendant should receive credit for the steps in preparing the coal to the state where it becomes coal f.o.b. the mine. Especially is this so where, as here, plaintiffs are relying on defendant's sales price for valuation.

■■ Defendant's argument that evidence of its costs of mining should have been admitted stands on a different footing. Defendant argues that had it not mined plaintiffs' coal, it would not have incurred these costs.

True—but if that were the case, then defendant would not have been a trespasser, either. Here again, the good faith/wilful trespasser issue is crucial. The rule of damages does not allow a wilful trespasser to deduct mining costs, but costs of mining are quite relevant in the case of a good-faith trespasser.

## D. STATEMENT BY PLAINTIFFS' ATTORNEY

As plaintiffs' counsel was about to use a deposition to impeach George Seaman, a registered surveyor employed by Zeigler, defendant's counsel objected. Plaintiffs' counsel stated:

> "This is a witness under the control of the Defendant. He's an employee of the Defendant. A person who made measurements and who made responses to questions concerning measurements and now he is starting to allude. He's making a statement different from what he made before."

■■ The trial court denied defendant's motion for mistrial but ruled that the witness could not be impeached. Error, if any, did not affect the verdict and is governed by the harmless error doctrine. *Lawson v. G. D. Searle & Co.* (1976), 64 Ill. 2d 543, 356 N.E.2d 779.

## E. JURY INSTRUCTIONS

Defendant complains of the trial court's rulings on some 15 of the tendered instructions. Since 12 of those instructions go to measure of damages, definitions, issues, or burdens of proof, we do not need to minutely deal with them. Our substantive treatments in this opinion clarify how the jury is to be instructed in those matters in the event of a retrial of this cause.

We are prompted, however, to comment upon the other three of those instructions: Plaintiffs' #5 and defendant's #17 and #18.

■■ ■ Plaintiffs' #5. Defendant contends it was error to give this one because it told the jury, "The Court had already entered a judgment that the defendant is liable to the plaintiffs for the mining of coal from the plaintiffs' property" and characterized the lawsuit as "* * * an action for trespass to land." Zeigler's tendered instruction advised the jury that plaintiffs sought recovery for trespass by defendant and told the jury they were to decide the amount of "just compensation to be paid plaintiffs." We cannot see the giving of plaintiffs' instruction as error, and defendant's instruction is no more accurate or less argumentative. Furthermore, the injection into the case of the eminent domain concept of "just compensation" would not have been proper.

Defendant's #17 and #18. Both recited that a verdict must be unanimous. Both were denied. The pertinent part of Illinois Pattern Instructions, Civil, No. 45.01 (2d ed. 1971) (hereinafter IPI) reads:

> "Forms of verdict are supplied with these instructions. After you have reached your verdict, fill in and sign the appropriate form of

verdict and return it into court. The verdict should be signed by each of you. You should not write or mark upon this or any of the other instructions given you by the court."

There is nothing in this—or any other—IPI Civil instruction concerning unanimity of verdicts. No. 17 adds the language: "In order to return a verdict, it is necessary that each juror agree. Your verdict must be unanimous." No. 18 adds to the IPI form only: "Your verdict must be unanimous." The court refused #17 and #18 and gave the plaintiffs' #7 in IPI form.

■■ Not only was the verdict signed by each member of the jury, but the record reflects that it was also polled. While we consider it a better practice to have the jury instructed that their verdict must be unanimous—and hope that the IPI Civil instruction will be amended accordingly—there was no error here.

### F. VERDICT BY PASSION OR PREJUDICE

There is no basis for claiming that the verdict was the result of passion or prejudice on the jury's part. The trier of fact arrived at a simple arithmetic figure, based on the evidence. Coal was taken. Zeigler was liable. Given the terms of the trial court's charge, the jurors had little latitude. Error, if any, was in the charge.

### G. LACHES, ESTOPPEL, AND ACCORD AND SATISFACTION

The trial court, in the declaratory judgment on count III (term of lease), ruled that the laches, estoppel, and accord and satisfaction had not been proved. Defendant claims that these defenses are different as they pertain to the trespass count, yet any such differences are not pointed out in its briefs. We do not perceive the distinction.

■■ Zeigler points out that it expended large sums of money in developing its mine over many years, and claims that the Dethloffs simply stood by until their coal was mined. As we view the case, defendant had notice of an adverse claim long before it entered plaintiffs' land. Plaintiffs sued soon after the entry. Laches, of course, akin to a statute of limitations, would relate to the time element. We have here only a couple of months between entry and suit. This clearly is not the type of case for which estoppel is intended: "A" builds a garage; "B" watches without protest, knowing that "A" is mistaken in building on "B's" land; "B" claims the finished product. Laches and estoppel simply don't apply.

■■ The accord and satisfaction is said to arise from plaintiffs' retention of royalty checks issued in early 1976. Mr. Dethloff, however, asserted that he retained these checks only to later prove the quantity of coal taken, and the fact that they were never cashed or deposited appears to us to cause this theory to dissipate.

### H. DIRECTED VERDICT DENIED

■■ Defendant argues that a verdict should have been directed because

plaintiffs failed to introduce any evidence of the value of the coal at the mouth of the pit. But even if there were an absolute failure of proof on the measure of damages, defendant would not be entitled to a directed verdict in a trespass case, since the law implies at least nominal damages for the wrong. Additionally, there is an alternate rule of valuation from the *Donovan* and *Smothers* cases: value of the coal f.o.b. the mine. Plaintiffs proved this measure when they introduced the defendant's sales records for coal f.o.b. the mine.

## I. SUMMARY JUDGMENT ON PUNITIVE DAMAGES COUNT

■■ We conclude that the trial court correctly precluded the jury from considering the punitive damages alleged in count II. We so hold for three basic reasons:

First, Zeigler's conduct was not oppressive or vindictive, even though it may have been a wilful disregard of the Dethloffs' rights. This is highlighted by the fact that defendant kept accurate records of what it took from plaintiffs' land (although the records are apparently required by law). The fact that a defendant displayed a conscious disregard or indifference to the rights of a plaintiff should not be enough here, because oppression must also be present—or other circumstances which can be said to equate oppression. In *Roark v. Musgrave* (1976), 41 Ill. App. 3d 1008, 355 N.E.2d 91, punitive damages were awarded, in addition to the value of timber cut. But there, the scenic beauty of land bought for recreational use was impaired. In *Miller v. Simon* (1968), 100 Ill. App. 2d 6, 241 N.E.2d 697, realtors had stripped topsoil from two lots owned by plaintiff, and had dumped gravel on them, all in furtherance of developing the 300 surrounding lots which they owned. The court termed the actions of defendant in response to protests by plaintiffs as defiant, irresponsible, and aggravating. Punitive damages were allowed.

Second, the measure of damages in cases of this nature does more than simply compensate plaintiffs for any loss. In fact, there is inherently involved a punitive aspect already. (See Annot., 21 A.L.R.2d 380, 382 (1952).) The economic value of this coal to these plaintiffs, who could not themselves mine it, was the value of the right to mine, or the 15 cents per ton royalty.

Third, punitive damages are not favored in the law, and their application is to be carefully watched. In *Knierim v. Izzo* (1961), 22 Ill. 2d 73, 174 N.E.2d 157, the supreme court decided that an action is maintainable by the widow against the murderer of her husband for great mental anguish that resulted from the defendant's threat to her that he would kill her husband and the fulfillment of the threat. The supreme court said:

> "Whether punitive damages may be assessed in a particular case is properly a question of law. [Citation.] Generally such damages

may be recovered in cases where the wrongful act complained of is characterized by wantonness, malice, oppression or circumstances of aggravation. [Citation.] The alleged conduct of the defendant in intentionally causing the severe emotional disturbance is characterized by these elements. Indeed it is the outrageous nature of his conduct that forms the basis for the action. We believe, nevertheless, that punitive damages cannot be sanctioned as an additional recovery in such an action. Since the outrageous quality of the defendant's conduct forms the basis of the action, the rendition of compensatory damages will be sufficiently punitive." 22 Ill. 2d 73, 87-88, 174 N.E.2d 157, 165.

Plaintiffs have shown nothing more malicious, oppressive, or aggravating than the action of trespass contemplates, and punitive damages are not warranted.

## CONCLUSION

Zeigler was entitled to have the issue of good faith submitted to the jury. Because the trial court precluded this, a new trial is necessary. However, we are graphically aware of the weeks devoted to the trial of this cause, the plethora of pleadings and motions involved, the countless legal and judicial manhours devoted, and the vast financial expense entailed. In order to hopefully avoid a replay of such efforts, we would prefer to utilize a procedural device found in *Smothers v. Cosgrove-Meehan Coal Co.* (1932), 264 Ill. App. 488. We believe that one reasonable approximation of a fair verdict can be arrived at by multiplying the tonnage of 215,247 by the net profit of $7.31, equaling $1,573,455.57. (The tonnage represents a net figure after deducting impurities. Counsel for plaintiffs argued to the jury that $17.91 was the average price per ton realized by defendant. Defendant claims that its cost was $10.60 per ton.)

The bottom line is this: If plaintiffs will agree to remittitur within 28 days, in the office of the clerk of this court, the judgment will be affirmed in the amount of $1,573,455.57. Otherwise, the cause is reversed and remanded for a new trial on count I in a manner consistent with this opinion.

(Caveat: By positing the facts upon which the suggested verdict is based, this court expresses no view as to the validity of the facts, or their relevance in any further proceedings.)

Affirmed upon remittitur; otherwise, reversed and remanded for a new trial.

REARDON, P. J., and TRAPP, J., concur.

## SUPPLEMENTAL OPINION

Mr. JUSTICE MILLS delivered the opinion of the court:

The remittitur reducing the amount of the judgment to $1,573,455.57 having been filed in this court on March 14, 1979, the judgment of the circuit court as modified is affirmed.

Judgment affirmed.

REARDON, P. J., and TRAPP, J., concur.