Argued May 4, affirmed September 6, 1961

# FREMONT LUMBER COMPANY v. STARRELL PETROLEUM CO.

**364 P. 2d 773**

*William Huey,* Eugene, argued the cause for appel-

lant. With him on the briefs were Frank B. Reid, Eugene, and Welch & Welch, Lakeview.

*Ronald W. Husk,* Eugene, and *Theodore R. Conn,* Lakeview, argued the cause for respondent. With them on the brief were Butler, Husk & Gleaves and Jack A. Gardner, Eugene.

Before McAllister, Chief Justice, and Warner, Sloan, O'Connell and Lusk, Justices.

WARNER, J.

This is a suit to quiet title to approximately 25,000 acres of land in Lake County, Oregon. The plaintiff, Fremont Lumber Company, hereinafter called Fremont, and the defendant Starrell Petroleum Co., hereinafter called Starrell, are corporations. From a decree in favor of Fremont, the defendant Starrell, alone, appeals.

On August 25, 1954, Fremont entered into a lease with Starrell covering all the land above mentioned "for the purpose of investigating, exploring, prospecting, drilling and mining for and producing oil, gas, sulphur and all other minerals."

The extent and legal significance of Starrell's activity thereon is the subject of this litigation. According to its president-treasurer and majority stockholder, Starrell's endeavors were limited to prospecting for metallic minerals with no interest in oil or gas.

There is no dispute that the lease was in full force and effect during its primary period, i.e., from August 25, 1954, to August 25, 1959, and that the necessary "annual delay" rentals of ten cents per acre had been paid during those years. However, Starrell began no operations of any kind on the land until some-

time late in July, 1959, a few days before the end of the primary period.

Starrell assigns a number of issues, but we think that there are only two issues which are determinative of the case: (1) Was the lease in question so written as to be of the "unless" type upon a special limitation which expired automatically at the end of the primary term or was it of the "or" type upon a condition subsequent, as urged by the appellant? (2) Did the activity of Starrell on the leased lands during the primary term qualify as "operations for * * * mining" within the pertinent extension provisions of paragraph 6 of the lease?

Notwithstanding that we hereinafter make reference to but a few of the 13 numbered paragraphs of the long and printed instrument before us, we have carefully examined it in its entirety to ascertain its meaning and the intent of the parties, but find need to refer more particularly only to those paragraphs which are persuasive in formulating our conclusions.

While the precise questions presented here concerning a mining lease have never before been passed upon in this court with reference to leases of like character, they have been squarely met in jurisdictions wherein oil, gas and mineral leases are far more common than they are in this state. Such decisions come to us with a distinctive nomenclature. They also bring, in addition to the rules of construction generally employed in construing agreements, some rules peculiarly and distinctively applicable to mining leases of the kind now before us.

■ Mining leases form a distinct class of instruments, creating special and peculiar legal rights and relations. In their principal features they are not unlike other leases, but in their purpose and operation they

approach more closely gas and oil leases (36 Am Jur 309, Mines and Minerals § 39) and the courts generally apply the same rules of construction to them alike. *Chandler v. French,* 73 W Va 658, 81 SE 825, 828; 36 Am Jur 316 Mines and Minerals § 52. See Ann Cas 1917E, 1123, and cases there cited.

Over the years there have been developed two typical classes of oil, gas and mineral leases. They are characterized both by courts and text writers as the "or" type (sometimes called the "drill or pay" type) applied to leases on condition subsequent, and the "unless" type applied to leases on special limitation.

The distinction between these types is explained by a leading authority on oil and gas leases:

> "The 'or' and 'unless' clauses may be distinguished as to the manner of terminating the lessee's interest and on the basis of the obligations which the lessee undertakes. The *unless clause* is one of special limitation that terminates ipso facto according to its terms upon failure to drill or pay. The lessee does not promise either to drill or pay, but if the lease is to continue, he must do one or the other. The *or clause* is one of condition subsequent that requires affirmative action by the lessor or lessee for termination. The lessee affirmatively covenants to drill or pay * * *. The 'or' clause is seldom used today * * *." Sullivan, Handbook of Oil and Gas Law, 105-106 (1955). See, also, 2 Summers, Oil and Gas (perm ed), 397-399, § 337.

■ When a lease is of the "unless" type or optional as to one party, it will be strictly construed against the lessee. *Phillips Petroleum Co. v. Curtis,* 182 F2d 122, 125 (10th Cir 1950); *Stanolind Oil & Gas Co. v. Guertzgen,* 100 F2d 299, 300 (9th Cir 1938); *Hill v. Stanolind Oil & Gas Co.,* 119 Colo 477, 205 P2d 643, 649 (1949); *Solberg v. Sunburst Oil & Gas Co.,* 76

Mont 254, 246 P 168, 172; *Lewis v. Grininger,* 198 Okla 419, 179 P2d 463, 464; 2 Summers, supra, at 485, § 372; Sullivan, supra, at 84; 58 CJS 439-440, Mines and Minerals § 197.

The reason for the rule is well stated by Sullivan, supra, at 84. He says:

"In spite of an almost universal practice to use printed lease forms and to pay a substantial bonus for the execution of the lease, the courts continue to apply the canon of construction that differentiates the oil and gas lease from leases generally, *i.e.,* it is to be construed strictly against the lessee and in favor of the lessor. This is not an arbitrary rule, inasmuch as it represents a construction in the light of the surrounding circumstances and against the party who selects the language used in the instrument. It is chiefly applied to broad provisions favoring the lessee. The canon of construction that has had the most profound effect upon the law applicable to, and the evolution of, lease clauses, is that the lease is to be construed in the light of the subject matter and the situation of the parties to promote development and prevent delay. * * *"

And, as said by some courts, the rule is for the protection of the landowner and the public generally. *Solberg v. Sunburst Oil & Gas Co.,* supra (246 P2d at 172); *Stanolind Oil & Gas Co. v. Guertzgen,* supra (100 F2d at 300).

With these basic differences in mind, we proceed to determine whether the instant lease is of the "unless" type or the "drill or pay" variety.

Our first inquiry is whether this lease would have terminated automatically at the end of the primary term; that is, without any notice or re-entry by Fremont, the lessor.

■ In an estate on condition subsequent the title does not revert upon a mere breach of the condition. On the happening of such a contingency it is still neces-sary for the grantor, in order to regain title, to mani-fest an intention to terminate the estate by giving notice or by the exercise of his right of re-entry. But in estates of special limitation a reverter *ipso facto* occurs. In such estates no action on the part of the person creating the same is necessary. The termina-tion is accomplished by the happening of the event itself. *Clark v. Jones,* 173 Or 106, 108, 144 P2d 498 (1943); *Magness v. Kerr,* 121 Or 373, 379-380, 254 P 1012, 51 ALR 1466 (1927); O'Connell, Estates on Con-dition Subsequent and Estates on Special Limitation in Oregon, 18 Or L Rev 63 (1939).

■ Paragraph 2 is typical of the habendum clauses found in the "unless" leases. Sullivan, supra, 95, § 40. That paragraph reads:

"Subject to the other provisions hereof, this lease shall be for a term of five (5) years from this date (called 'primary term') and as long there-after as oil, gas or other mineral is produced from said land or lands with which said land is pooled."

From 1A Summers, supra, 380, § 153, we also take the following:

"* * * Where an instrument purports to grant the oil and gas under a tract of land, or the privilege of taking oil and gas from the land, for a definite term of years and as long thereafter as oil and gas are produced from the land in paying quantities, it has all the earmarks of an estate on special limitation. * * *"

Again, we turn to Sullivan, supra, where we find at pp 96-97, the following elucidating statement:

"The most commonly used habendum clause [in mining leases] is referred to as the *clause of special*

*limitation.* It consists of two parts, the *primary term,* also called the *exploratory period,* which is for a definite period ranging from 60 days to 10 years depending upon whether the land is in proven or wildcat territory, and the *secondary term,* also called the *thereafter clause,* which is of indefinite duration. Actually there are two limitations, and not merely one, which control the duration of the lessee's interest, i.e., there must be production at the end of the primary term in order to extend the lease,   *   *   *."

The foregoing statements from Summers and Sullivan are abundantly supported by case authority. See *Dabney v. Edwards,* 5 Cal2d 1, 53 P2d 962, 103 ALR 822, 830 (1935) ; *Woodside v. Lee* (ND 1957), 81 NW2d 745, 746; *Valentine Oil Co. v. Powers,* 157 Neb 71, 59 NW2d 150, 159 (1953) ; *Kugel v. Young,* 132 Colo 529, 291 P2d 695 (1955) ; *Petroleum Engineers Producing Corp. v. White* (Okla 1960), 350 P2d 601, 604.

We note particularly the court's statement in *Woodside v. Lee,* supra (81 NW2d at 746) :

"The generally accepted construction of the provisions for the termination of an 'unless' lease is that the 'unless' clause does not state a condition subsequent upon which the lease may be forfeited but states a common-law or special limitation upon which the interest of the lessee terminates immediately.   *   *   *"

Usually, an estate on special limitation is characterized by the use of certain apt words. Typical words, says O'Connell, supra, are "so long as," "until" or "during." In the instant lease we are repeatedly met with the phrase "as long as" or "as long thereafter as."

Paragraph 2, however, must be read together with

all other applicable paragraphs. One of these is paragraph 4, which provides, as far as pertinent here:

> "If operations for drilling or mining are not commenced on said land or on land pooled therewith on or before two years from this date, this lease shall terminate as to *both parties, unless* on or before two years from this date lessee shall pay or tender to lessor a rental of ten cents (10¢) per acre, which shall cover the privilege of deferring commencement of such operations for a period of one year. In like manner and upon like payment or tender, annually, the commencement of said operations may be further deferred for successive periods of one year each during the primary term. * * *" (Emphasis supplied.)

Provisions akin to those of paragraph 4, supra, confer an optional right on the lessee to pay a rental stated to renew the lease and generally are treated as a special limitation, giving rise to a strict construction in favor of the lessor and against the lessee. *Valentine Oil Co. v. Powers,* supra (59 NW2d at 159).

From our examination of the authorities, we think it is correct to say that paragraph 4 contains a typical "unless" drilling clause. A very similar clause was so construed by Judge Orie L. Phillips in *Gloyd v. Midwest Refining Co.,* 62 F2d 483, 485 (10th Cir 1933).

The language of the lease thus far reviewed compels the conclusion that it is one of special limitation with the incident of automatic termination at the end of the primary term unless some other provision of the lease can be invoked in the defendant's aid, but we find none.

Starrell relies heavily upon the provisions of paragraphs 6, 9 and 13(b) to circumvent the construction which we have above indicated.

Paragraph 9 reads:

"The *breach* by lessee of any *obligation* arising hereunder shall not work a forfeiture or termination of this lease, nor cause a termination or reversion of the estate created hereby nor be grounds for cancellation hereof in whole or in part. In the event lessor considers that operations are not at any time being conducted in compliance with this lease, lessor shall notify lessee in writing of the facts relied upon as constituting a *breach* hereof, and lessee, if in *default*, shall have sixty days after receipt of such notice in which to *commence compliance with the obligations imposed by this lease.*" (Emphasis supplied.)

Starrell complains that it received no notice of any breach of the lease. It claims that under paragraph 9 it had 60 days after such notice in which to commence compliance with the lease terms. It also points to paragraph 13(b) in further support of this position, the relevant part of which reads:

"That in the event Lessee shall be found to have breached one or more covenants of this lease by final judgment of a court of competent jurisdiction, and shall fail to remedy such breach or breaches within a reasonable time after such judgment becomes final, this lease may be terminated as to any portion of the leased lands in respect of which the breach was committed;  *  *  *."

Paragraph 9 does not change the lease from one on a special limitation to one on a condition subsequent. Paragraph 9 speaks of obligations and breaches thereof. But when the "unless" clause is found in a lease the lessee does not covenant to drill or pay. 3 Summers, *supra*, at 115, § 452. Since there is no covenant in the lessee to *drill or pay rent* or conduct operations, and such payments and activities are optional, the breaches referred to in paragraphs 9 and 13(b)

are limited to such covenants and obligations as may be found elsewhere, such as the promises to pay certain royalties when oil or minerals are produced, as set forth in paragraph 3, or to repair fences and bury pipe lines, as provided in paragraph 7, or to repair fences and fill holes, etc., as found in paragraph 13(c). 3 Summers, supra, 115, 366, §§ 452, 469 (and cases there cited); *Richfield Oil Corp. v. Bloomfield,* 103 CalApp2d 589, 229 P2d 838, 840 (1951). It will be noticed that in the main the breaches of obligation calling paragraphs 9 and 13(b) into play are defaults which would ordinarily arise after production had begun.

We are impressed with the wisdom behind the theory of automatic termination as expressed in *Richfield Oil Corp. v. Bloomfield,* supra, at 840:

"It should be observed that this rule of automatic termination is correct not only as a matter of proper and reasonable interpretation of the lease agreements but is based on sound considerations of policy as well. The duty to drill and explore the property, where no substantial cash consideration is involved, should be treated not as a mere covenant but as a condition to the lease's continued existence for the reason that practically the entire consideration depends on the undertaking. Certainly, the lessee should not be assisted and encouraged to hold the lease for speculative purposes only without making any attempt to develop the property's possible resources. * * *"

Therefore, Starrell's contentions concerning a want of notice of breaches on the part of Fremont have no merit. Moreover, no covenants have been breached, nor does Fremont rely thereon for relief.

Much of Starrell's argument depends upon its construction of paragraph 6. It bases its so-called right

to continue exploration beyond the primary term upon this section of the lease.

We need quote only that part of paragraph 6 upon which defendant relies and a further portion following, which we deem essential to a balanced consideration of appellant's viewpoint. The portion upon which Starrell depends reads:

"* * * *  *If* at the expiration of the primary term, oil, gas or other mineral is not being produced from said land or land pooled therewith, *but* lessee is then engaged in operations for drilling, mining or reworking of any well or mine thereon, this lease shall remain in force  *  *  *." (Emphasis supplied by appellant.)

To this we add the following words which follow immediately after the foregoing quotation:

"* * *  *so long* as such operations or additional operations are commenced and prosecuted (whether on the same or successive wells or mines) with no cessation of more than sixty consecutive days, and if they result in production, *so long thereafter as* oil, gas or other mineral is produced from said land or land  *  *  *." (Emphasis ours.)

With reference to the part of paragraph 6 as quoted by defendant Starrell, it says in its brief:

"The effect of the clause is the lessor had the option to *terminate upon the occurrance* [sic] *of the discontinuance of the mining operations.* That is, *if* no minerals are being produced, *'but'* the lessee is operating, *'then'* the lease *remains in force.* This is essentially a *'but if'* phrase indicating a condition subsequent and not a *'so long as'* type phrase indicating a special limitation."

Here, again, we are impressed by the apt words of limitation emphasized above. We fail to see how an additional drilling clause of the type engrafted in

paragraph 6 magically changes this lease from a determinable estate upon a special limitation to an estate on a condition subsequent. At best the effect of this clause is only to redefine the event or condition upon the occurrence of which the lease will *ipso facto* terminate.

The declared object of the lease, as stated in paragraph 1, was for "* * * the purpose of investigating, exploring, prospecting, drilling and mining for and producing oil, gas, sulphur and all other minerals, * * *." Starrell contends that under this broad statement of purpose the lease might be kept alive indefinitely by merely exploring, investigating and prospecting. With this we cannot agree.

The primary term is often denominated the "exploratory period" or "initial period" of an oil and gas lease. The primary term of the instant lease was the time for the exploring, investigating and prospecting and not after that term expired. 2 Casner, American Law of Real Property, 587, § 10.30; 2 Summers, supra, 190, 199, 200, §§ 288, 292, 293; Sullivan, supra, at 96.

In *Dabney v. Edwards,* supra (53 P2d at 968), the court in discussing the typical habendum clause of an "unless" oil, gas and mineral lease stated:

"* * * Obviously the lease is divided as to duration into two parts, the definite term, commonly called the exploratory period, and the indefinite term, beyond the exploratory period, for which the lease may be extended by production. The 'thereafter' clause [paragraph 6] prescribes the condition of fact which must exist within or at the end of the exploratory period of the lease upon which the lease may be continued beyond the definite term, as well as the conditions which must exist after the end of the exploratory period upon which the lease may continue indefinitely. In other words, during the definite fixed term, the lessee

must complete its exploratory work (except in very exceptional cases when for some equitable reason the definite term may be extended) and having discovered and produced oil upon the leased premises within the definite fixed term must continue such production during the remainder of the fixed term in order to be entitled to continue the lease thereafter, and may continue as lessee thereafter only so long as production is continued. It is thus apparent that there are in fact two periods of time provided for by the habendum clause in such leases; the definite fixed term for exploration and discovery which vests immediately upon the execution of the lease and terminates in the absence of earlier forfeiture at the expiration of the definite fixed term, and, secondly, the indefinite period for production which likewise vests immediately upon the execution of the lease and continues until oil or gas is no longer produced."

That investigating, exploring and prospecting is limited to the primary term of the instant lease is further borne out by the fact that the extension provision in paragraph 6 refers only to operations "for drilling, mining or reworking" and does not repeat the terms "investigating, exploring and prospecting" found in paragraph 1. In 2 Summers, supra (at 202), we find the following:

"* * * *Thereafter* refers to the end of the definite term. But what must the lessee do before the end of the definite term to extend the lease beyond the term and keep it alive? If the state of fact necessary for the continuance of the life of the lease beyond the definite term is production in some quantity, it seems that the only logical deduction as to the act required of the lessee for the extension of the lease beyond the definite term is that he be engaged in production of oil or gas from the land, in some quantity, before and at the end of the definite term. If he is not so acting

at that time, the lease ends by its own terms, and certainly has no basis for renewed life, if production is accomplished a day or a year later. \* \* \*"

■ The phrase "operations for \* \* \* mining" found in paragraph 6, supra, does not embrace prospecting activities. Prospecting, exploring and investigating are not "mining." This is made manifest by judicial and lay definition and the testimony of mining experts who were witnesses at the trial.

In its primary sense the term "mine" or "mining" is defined to mean extraction of minerals from beneath the surface of the earth by means of tunneling and shafting. 58 CJS 14, 15, Mines and Minerals § 1; 36 Am Jur 281, Mines and Minerals § 2.

In *J. M. Guffey Petroleum Co. v. Murrel,* 127 La 466, 53 S 705 at 711 (1910), the court considered the meaning of the terms "mine" and "mining operation," and said that:

"'\* \* \* When the term mine is used, it is generally understood that the excavation so named is in *actual course of exploitation* \* \* \*. No occurrence of ore is designated as a mine unless something has been done to develop it by actual mining operations. \* \* \*'" (Emphasis supplied.)

More recently the Kentucky Court of Appeals has had occasion to consider the same subject. In *North American Refractories Co. v. Jacobs* (Ky 1959), 324 SW2d 495, the Supreme Court of that state said, at p 497:

"At the expiration of the renewed term, on April 28, 1955, while appellant may have been 'operating' on the premises, it was not 'mining' clay. Mining means the excavation or removal of minerals from a natural deposit. \* \* \*"

See, also, *Atlas Milling Co. v. Jones*, 115 F2d 61, 63 (10th Cir 1940); 1 Lindley, Mines (3d ed), 135, § 88.

In 1910 this court, in *Escott v. Crescent Coal & Nav. Co.*, 56 Or 190, 192, 106 P 452, defined the word "mine" in relation to a lien statute as follows:

> "The primary meaning of the word 'mine,' standing alone, is an underground excavation, made for the purpose of getting minerals, or a pit or excavation in the earth from which metallic ores, or other mineral substances, are taken by digging, but it may also include the deposit, bed, or vein of mineral substance, into which the pit or shaft enters. * * *"

The witness Kutz, a graduate mining engineer of wide experience, and at the time of the trial superintendent of a substantial mining operation immediately adjacent to the areas where Starrell did much of its drilling, gave the following answers to questions propounded by the court:

> "Q In that regard is there a difference between the terms 'prospecting' in the mining field and actual 'mining?'
>
> "A Yes, there is.
>
> "Q What is the difference between those terms so far as your knowledge of the usage of those terms is concerned in the mining field?
>
> "A Prospecting would be looking for ore and mining would be the removal of ore.
>
> "Q Of course it is prospecting proceeds the mining operation generally?
>
> "A Precedes, yes.
>
> "Q Where does one stop and one leave off in * * * your opinion * * *?
>
> "A I think a definition of the word 'mining' is the extraction of useful minerals from the earth's crust so that once the extraction of minerals starts, then mining starts.

"Q That would be your definition of the word if you were talking about a mining operation?

"A Yes, it would be the extraction of the useful minerals, would not be the looking for useful minerals."

Later, counsel asked Mr. Kutz if the Fremont area had been adequately prospected and he answered that it had not.

Mr. Robinson, another graduate mining engineer of considerable mining experience since 1931, both in this and several foreign countries, made it clear by his testimony that prospecting, exploring and investigating did not comprehend "mining" or operations for mining.

We hold the lease contemplated that the exploratory period would be completed within the primary term.

Our inquiry now centers upon what Starrell actually accomplished during the primary term and before its termination on the twenty-fourth day of August, 1959, and whether prior to that date its exploratory and prospecting activities had led to discoveries warranting an extension for the purpose of "drilling, mining, etc."

To succeed Starrell must show whether the nature of its activity falls within the meaning of the clause in paragraph 6, reading: "* * * but lessee is then [at the end of the primary term] engaged in operations for * * * mining * * * thereon, this lease shall remain in force * * *."

The evidence reveals very little done in the way of excavation. No ore at all was taken from the ground as far as the record shows. The only excavations that were made were for the purpose of leveling sites for the drilling rig. No structures were erected on the

premises and no materials were brought on the land for that purpose. None was even purchased. There is not one iota of evidence that Starrell was engaged in any form of mining. Even the so-called prospecting was very limited and perfunctory.

After waiting for nearly five years, Starrell entered the property for the first time about 28 days before the end of the primary or exploratory period. It began drilling on July 29, 1959, and continued the same intermittently until September 14 or 15, 1959. The evidence most favorable to Starrell does indicate, as it suggests, that it was carrying on activities exploring for minerals at the expiration of the primary term. However, we have no interest in its activities subsequent to August 24, 1959, unless those activities prior thereto resulted in discoveries warranting the application of the extension clause of paragraph 6 and upon which the success of Starrell's appeal depends.

The Mayhew drill used was declared by testifying experts of broad experience as of a kind absolutely incapable of drilling gas or oil wells and had a limit for exploratory purposes to a depth of 1,000 feet if equipped with a drill stem of longer than 395 feet, the length of the one being used by Starrell.

From the same source we also learn that the Mayhew drill is not used for mining metals except for "drilling core holes and probe holes." During the time of Starrell's first and last entry on the land, it had up to September 14, 1959, drilled nine prospect holes on the 25,000 acres of land. These varied from 15 feet to one 345 feet in depth, representing a combined total depth of approximately 1,100 feet. The drill was operated by two men, only one of whom had any pre-

vious drilling experience. Whether that experience was in mining the record does not show.

The only other persons laboring for Starrell during this time were two loggers. They were employed to level the drilling sites. One worked a total of seven hours, the other one day. As far as revealed by the record, this is the only work which Starrell did on the leased premises during the five years of the primary term, except build a so-called bridge across a very narrow ditch at the side of the road. Exhibit F is a photograph of this structure and shows it to consist primarily of two planks loosely placed in position and apparently to temporarily accommodate the movement of the drill in crossing. Just what part of this activity took place before August 24, 1959, and what part after that date is not revealed.

But irrespective of the timing we have no difficulty in classifying the activities of Starrell on and prior to August 24, 1959, as investigating, exploring or prospecting. Nor did these efforts find any reward in the discovery or production of gas, oil or commercial minerals. They were activities fruitless both to the lessee and lessor.

The expert Kutz in response to a hypothetical question gave as his opinion that Starrell had not even adequately prospected the property. Robinson testified that the work of Starrell did not constitute mine working.

■ The operations of Starrell are subject to condemnation by reason of another rule applicable to leases of this kind. Good faith must be evident to secure the judicial approbation which Starrell seeks. With it must be a showing of an ability to carry on.

The importance of good faith, a *bona fide* intention and ability to diligently prosecute operations look-

ing to the production of oil, gas or minerals and the absence of a speculative interest is emphasized by the following authorities: 2 Summers, supra, at 461, 485, §§ 349, 372; *Muth v. Aetna Oil Co.,* 188 F2d 844, 848 (7th Cir 1951); *Gillespie v. Dougherty,* 179 Okla 330, 65 P2d 486, 489; *Reynolds v. White Plains Oil & Gas Co.,* 199 Ky 243, 250 SW 975, 976; *Street v. Masterson* (Tex Civ App 1925), 277 SW 407; *Woods v. Bost* (Tex Civ App 1930), 26 SW2d 299, 304; *Illinois Mid-Continent Co. v. Tennis,* 122 Ind App 17, 102 NE2d 390, 393, 394 (1951); *Geier-Jackson, Inc. v. James,* 160 F Supp 524, 529 (ED Tex 1958). The overall tenor of the foregoing cases poses the test: whether the defendant lessee was ready, willing and able to prosecute its activities diligently within the primary term to the point of ultimate production of oil, gas or minerals.

■■ The consideration stated on the face of the lease was one dollar and the delaying rentals were nominal at ten cents an acre. It is, therefore, quite evident that the real consideration expected by the lessor was the prospect of royalties from production and, therefore, such leases should be construed against the lessee to prevent delay and to effectuate the intended purpose, i.e., to promote production and development. *Hill v. Stanolind Oil & Gas Co.,* supra (205 P2d at 649); *Parish Fork Oil Co. v. Bridgewater Gas Co.,* 51 W Va 583, 42 SE 655, 660. This intended purpose included the obligation that the lessee would test and develop the property in good faith and proceed with reasonable diligence to obtain production. See *Richfield Oil Corp. v. Bloomfield,* supra (229 P2d at 84); *Warfield Natural Gas Co. v. Allen,* 248 Ky 646, 59 SW2d 534, 91 ALR 890, 894; 2 Summers, supra, at 484, 486, §§ 371, 372; 36 Am Jur 425, Mines and Minerals § 210; 58 CJS 458, 459, Mines and Minerals § 202.

As said in *Munroe v. Armstrong*, 96 Pa 307, 311 (1880): "* * * Perhaps in no other business is prompt performance of contracts so essential to the rights of the parties, or delay by one party likely to prove so injurious to the other. * * *"

An excellent definition of the required degree of good faith is found in *Street v. Masterson*, supra (277 SW at 408):

> " 'By commencing a well in good faith means that it must have been commenced with an intention to pursue drilling with ordinary diligence to such depth as an ordinarily prudent operator would drill under the same or similar circumstances in search for oil or gas in paying quantities; that such drilling was commenced with such tools, machinery, and equipment as an ordinarily prudent oil operator would, under the same or similar circumstances, have provided to prosecute drilling in good faith.' "

See, also, *Geier-Jackson, Inc. v. James*, supra (160 F Supp at 529).

■ In a preceding paragraph we have called attention to the fact that Starrell waited until the last month of its five-year lease before entering upon the land to begin operations of any kind. The president of Starrell testified the corporation did not have the financial ability to proceed with any development plans. See *Muth v. Aetna Oil Co.*, supra (188 F2d at 849); *Gillespie v. Dougherty*, supra (65 P2d at 489). Its only asset was the lease in question. It had no equipment or employees except the few temporary ones above mentioned. It had no borrowing power or geologists, nor had it secured an oil, gas and well drilling permit from the state of Oregon. See *Illinois Mid-Continent Co. v. Tennis*, supra (102 NE2d at 394). There was no written plan for developing the 25,000 acres. The

company in the summer of 1959 was then attempting to interest others to speculate in the property. See *Muth v. Aetna Oil Co.,* supra (188 F2d at 849). The foregoing information from the president of Starrell warrants the conclusion that it was a speculator.

We deem the vast expanse of territory embraced in the instant lease, covering as it does nearly 39 square miles in the aggregate, an element of some significance in the determination of lessee's intentions. It offers some background for testing the lessee's diligence and measuring the sufficiency of its equipment to exploit the opportunity afforded. We do not mean to infer thereby that Fremont had a right to expect nor Starrell had a duty to explore or investigate the production possibilities of each and every acre or any substantial part of the leased area, but we do infer that such a vast expanse of potential opportunity for exploration did impose upon the lessee a high degree of diligence and good faith to begin earlier in the primary term and not in the last month of that time. Moreover, we are impressed with the rule of public policy underlying the concept of strict construction previously referred to, namely, that a lessee wanting in diligence, ability or good faith should not be allowed to suffer vast areas to remain idle while it uses the same to speculate to its personal advantage.

We hold that as of August 25, 1959, and prior thereto, Starrell was doing nothing more than prospecting for metallic minerals and that such work was not encompassed by the definition of being engaged in mining.

The judgment of the lower court is affirmed.