(No. 51950, 51953 cons.—

PHILLIP A. DETHLOFF *et al.*, Appellants, v. ZEIGLER COAL CO., Appellee.

*Opinion filed October 17, 1980.—Rehearing denied November 26, 1980.*

CLARK, J., took no part.
UNDERWOOD and RYAN, JJ., concurring in part and dissenting in part.

Leonard M. Ring, of Chicago (Leonard M. Ring & Associates; Arnold F. Blockman and Brian L. McPheters, of Hatch, Nicol, Blockman & McPheters, of Champaign; and Raymond Lee, Jr., of Tuscola, of counsel), for appellants.

Craig & Craig, of Mattoon (John H. Armstrong and Richard F. Record, Jr., of counsel), Baker & McKenzie, of Chicago (Francis D. Morrissey, Edward J. Zulkey and George H. Olsen, of counsel), and Latchford, Rice & O'Brien, of Chicago (James B. Rice, of counsel), for appellee.

MR. JUSTICE WARD delivered the opinion of the court:

On June 29, 1976, Phillip and Dorothy Dethloff filed a complaint in the circuit court of Douglas County alleging that the defendant, the Zeigler Coal Company (Zeigler), had unlawfully entered the plaintiffs' land in January of 1976 and mined coal which it later converted. Counts I

and II of the complaint asked for compensatory and punitive damages for trespass and conversion. Count III sought a declaratory judgment that the leasing agreement entered into by each party's predecessor in title and interest had expired by its terms on June 20, 1970. The trial court held in the plaintiffs' favor on count III but granted Zeigler's motion for summary judgment on count II on the issue of punitive damages. Count I was submitted to a jury, which returned a verdict of $4,019,867.08 in compensatory damages.

The appellate court affirmed. (69 Ill. App. 3d 133.) It judged, however, that the trial court's holding that the defendant was not, as a matter of law, a trespasser in good faith was an issue of fact which should have been submitted to the jury. The court reduced the judgment to $1,573,455.57, saying it did so to avoid the necessity of remanding the cause for a new trial. The plaintiffs consented to the remittitur. (See 73 Ill. 2d R. 366(b)(2)(ii).) The petitions for leave to appeal of the defendant and the plaintiffs were granted by us and the appeals consolidated. 73 Ill. 2d R. 315.

The predecessors of the parties in title and interest, that is, the original lessors and lessee, entered into a leasing agreement on June 20, 1945, whereby the lessee was given the right to mine all of the subsurface coal contained within the lessor's 40-acre tract of land located in Douglas County. This parcel was but one of many such properties in the area whose owners, through leasing agreements, had extended similar, if not identical, mining rights to those now held by Zeigler. The habendum clause of the lease here provided in part:

> "This lease shall be and continue for the term of twenty-five (25) years from and after the date hereof, and for so long thereafter as shall in the opinion of Lessee be necessary to mine and remove all of the coal in and under the above described leased lands and other lands in the vicinity thereof, or included in the block of leased coal here-

inafter referred to, unless this lease is sooner terminated as hereinafter provided and unless in the opinion of the Lessee the coal which can be economically mined in accordance with good and accepted mining practices from said lands shall be sooner exhausted."

In October of 1969, the Dethloffs, the plaintiffs in this case, acquired their 40-acre tract from Mr. and Mrs. Joseph Taylor. A title search revealed the existence of the coal-leasing rights held by Zeigler. The defendant was not informed of the conveyance to the plaintiffs, and it continued to forward the annual rental fee of $80 to the Taylors. It was only when the Taylors returned the rental payment for 1971 that Zeigler became aware that the Dethloffs were the new owners of the tract.

When the defendant tendered this rental payment to the plaintiffs in October of 1971 their attorney wrote to the defendant stating that the lease had expired according to its own terms on June 20, 1970. The letter did indicate, however, that the Dethloffs were interested in renegotiating a new lease and, in particular, in renegotiating the royalty payment provision. During the 26-year period from June 20, 1945, until October of 1971 no coal had been taken or mined from the plaintiffs property by the defendant or its predecessor in interest.

Upon rejection of the rental payment by the plaintiffs Zeigler said it would exercise its right under the lease to withhold further payments of rent pending resolution of any disputed questions as to the rights of the parties. The defendant did not respond, however, to the plaintiffs' repeated overtures to renegotiate the lease. Negotiations were again attempted in 1975 by the plaintiffs after they became aware that Zeigler was planning to commence mining operations on the land either that fall or in the spring of 1976. Mining operations were commenced in January 1976, almost 31 years after the leasing agreement was executed.

A check for the royalty payment for coal mined in

January and February was delivered to the plaintiffs in March of that year. The Dethloffs reacted with a demand that Zeigler discontinue operations on their land. Though the Dethloffs filed suit that June, defendant continued its mining operation until December of 1976, when all of the coal that could be subterraneanly mined from the plaintiffs' land had been removed. The record shows that royalty checks delivered every month to the plaintiffs through December 1976 were not cashed but were retained by them in a safety deposit box as evidence of the amount of coal mined each month.

As the parties generally agree, the central question is the interpretation to be given to the mining lease. More specifically, the issue is whether the lease automatically expired by its provisions on June 20, 1970, after the 25-year term had expired, or whether it remained in effect until December of 1976, when defendant completed the removal of all of the subsurface coal from the plaintiffs' property.

Though the legal and economic interests as well as exploratory and extraction techniques involved in hard-mineral and coal production differ from those pertaining to fugacious substances such as oil and gas (see, *e.g.,* Norvell, *The Coal and Lignite Lease Compared to the Oil and Gas Lease,* 31 Ark. L. Rev. 420 (1977)), coal-mining leases closely resemble oil and gas leasing agreements. As a result, the body of the law and rules of construction used to interpret the latter instruments have been applied to coal-mining leases like the one here. See *Fremont Lumber Co. v. Starrell Petroleum Co.* (1961), 228 Or. 180, 364 P.2d 773; Fletcher, *Mining Leases and Gas Leases— Different Breeds,* 24 Rocky Mtn. Min. L. Inst. 309 (1978).

The habendum clause in the lease executed on June 20, 1945, is of the standard form found in oil and gas leases. It provides that the agreement to mine coal shall be in effect for "the *term* of twenty-five (25) years from and

after the date hereof [June 20, 1945], *and for so long thereafter* as shall in the opinion of Lessee be necessary to mine and remove all the coal in and under the above described leased lands \*\*\*." (Emphasis added.)

The purpose of the habendum clause in a lease is to define and measure the duration of the lessee's interest in the property to be developed. (See H. Williams, Oil and Gas sec. 604 (1977); 2 W. Summers, Oil and Gas secs. 281 through 307 (1959).) Typically, the clause is in two parts. The first part, or primary term, defines the time period within which production or removal must begin. The second part, or "thereafter" clause, extends the lessee's right to mine for an indefinite duration beyond the term of years, usually for as long as it is profitable to continue production or, in the terms of this lease, as long as "the coal \*\*\* can be economically mined in accordance with good and accepted mining practices \*\*\*." (See *Freeland v. Edwards* (1957), 11 Ill. 2d 395.) The "indefinite duration" clause does not come into effect, however, until production operations have begun within the primary term or period of the lease. Habendum clauses of this type generally have been interpreted as vesting the lessee with an interest subject to this special limitation that mining operations must commence within the primary period of the lease. Thus, if no production or significant mining operations have been initiated within the primary period the lease automatically terminates at the end of that period or term. (See *Fremont Lumber Co. v. Starrell Petroleum Co.* (1961), 228 Or. 180, 364 P.2d 773; *Brown v. Haight* (1969), 435 Pa. 12, 255 A.2d 508.) See also *Guffey v. Smith* (1915), 237 U.S. 101, 59 L. Ed. 856, 35 S. Ct. 526; H. Williams, Oil and Gas sec. 604 (1977).

Both the trial and appellate courts held that Zeigler's failure to mine coal from the Dethloffs' property within the lease's primary term of 25 years resulted in the automatic forfeiture or termination of all of the defendant's

mining rights and that it was liable for trespass and conversion.

The defendant presents several contentions basically to the effect that the interpretation given the lease by the trial and appellate courts was erroneous. The company first submits that the leasing agreement did not convey a leasehold estate subject to a special limitation but instead granted "a freehold estate or interest" subject to a condition subsequent. Under this theory the lessee's interest in mining the coal would not terminate automatically upon a breach by it but only when the lessor had taken affirmative action by either demanding performance by the defendant or by extinguishing its interest through a forfeiture proceeding. Since no such action was taken by the Dethloffs, Zeigler contends that its mining rights under the lease continued until all the coal was removed from the plaintiffs' land in December of 1976.

This court has uniformly held that mining leases which contain a primary term requiring exploration or development within a stated period, followed by a "thereafter" clause, are to be construed as conveying a freehold estate or interest, in the sense that unlike an estate strictly for a term of years the lessee's right to mine under certain circumstances may continue for an indefinite period. (See *Jilek v. Chicago, Wilmington & Franklin Coal Co.* (1943), 382 Ill. 241; *Daughetee v. Ohio Oil Co.* (1914), 263 Ill. 518; *Poe v. Ulrey* (1908), 233 Ill. 56; see also *Fowler v. Marion Pittsburgh Coal Co.* (1924), 315 Ill. 312; *Dabney v. Edwards* (1935), 5 Cal. 2d 1, 53 P.2d 962.) These cited holdings do not support a conclusion, as the defendant contends, that such freehold interests are always subject to a condition subsequent.

As previously described, this mining lease and its habendum clause are typical of those leases which require production within the primary term in order for the lessee's rights to be extended beyond the initial period or term. In

the Williams treatise on oil and gas law these leases are discussed:

> "A vast majority of the courts have construed such habendum clauses as conveying an interest subject to a special limitation rather than as conveying an interest subject to a condition, power of termination or right of re-entry. \*\*\* The consequences of this conceptual classification of the habendum clause as a clause of limitation is that lack of production at the end of the primary period or cessation of production after the expiration of the primary term results in an automatic termination of the lessee's interest. The language of this clause clearly supports this construction. \*\*\*
>
> The primary purpose of the lease clearly is to obtain production. It would, therefore, seem in accord with this objective as embodied in the language of the habendum clause that the duration of the lessee's interest, after a period of exploration, be limited by the continued use for the purpose for which that interest was created. While the courts may be generally opposed to a construction that results in an automatic termination, the policy behind this rule is not applicable to an oil and gas lease. The special limitation placed on the duration of the lessee's interest is not a frivolous condition or a whimsical limitation of the use of the interest." H. Williams, Oil and Gas sec. 604 (1977).

See also *Fremont Lumber Co. v. Starrell Petroleum Co.* (1961), 228 Or. 180, 364 P.2d 773; *King v. Garcia* (Tex. Civ. App. 1941), 152 S.W.2d 918, *rev'd on other grounds* (1942), 139 Tex. 578, 164 S.W.2d 509; Fletcher, *Mining Leases and Oil and Gas Leases—Different Breeds,* 24 Rocky Mtn. Min. L. Inst. 309 (1978); Ennis, *Drafting Leases and Other Documents Relating to Development of Western Coal,* 21 Rocky Mtn. Min. L. Inst. 93 (1976).

To counter the claim of an automatic termination of its rights the defendant points out that the agreement contains a forfeiture clause, which states:

> "It is further agreed that if at any time Lessee shall be in default in the performance of any of the covenants

and agreements herein contained by it to be performed, including default in payment of any sum or sums due for rent or royalty, as aforesaid, and shall continue in such default for the period of thirty (30) days after written demand served upon it by the Lessor, the Lessee shall forfeit all right to mine or otherwise hold and enjoy said leased lands, and after such default and demand and the failure to remedy the same, as aforesaid, the Lessor may enter into the exclusive possession thereof and hold the same free and clear of every and all claims of the Lessee ***."

Zeigler says this supports its argument that the lease is not subject to a special limitation, that is, to an automatic termination, but instead is subject to a condition subsequent that requires the lessor to first demand performance and reenter in order to terminate the lessee's rights. The "covenants and agreements" in the lease, to which this forfeiture clause applies in the event of default by the lessee, are the covenants to pay annual rent of $1 per acre for the first year of the lease and $2 per acre for the years thereafter; the covenant to pay royalties of $.05 per ton of "good, clean, washed merchantable mine run coal"; and the implied undertaking or covenant to produce. Zeigler contends that the breach of any of these covenants or agreements required at a minimum that the plaintiff, in order to satisfy the condition subsequent, first demand performance before the defendant's rights were forfeited. Since no such demand or attempt to reenter the property was made by the plaintiffs the defendant contends that the condition subsequent was not met, and the lease did not terminate automatically and thus remained in effect until December of 1976 when all the coal had been removed from the Dethloffs' land.

This argument fails because, *inter alia,* it does not even relate to the facts here. First, the covenant to pay rent was never breached during the primary period of the lease. Nor had the defendant violated the covenant to pay royalties, since production did not commence until 6 years after the

lease had automatically terminated. Also, the defendant could have satisfied the implied covenant to produce up until the last day of the primary term on June 20, 1970, and thus the Dethloffs would not have been within their rights as lessors to demand performance by production before that date. When the 25 years had elapsed, however, the plaintiffs certainly were no longer required to demand production, since the lease had already terminated without any requirement of notice to the defendant.

The habendum clause containing the described special limitation and the forfeiture provision imposing the condition subsequent were both part of the lease when the agreement was entered into on June 20, 1945. Had production begun within the primary term but been thereafter halted the lease would not have terminated automatically, but, instead, the plaintiffs would have been required under the terms of the lease to demand performance, and if the demand were to no avail, then to reenter the property before the defendant's rights would have been extinguished. There was no production here in the primary term, and therefore no obligation to demand or reenter was imposed upon the Dethloffs either before or after June 20, 1970.

Also, to support its argument that the lease is subject only to a condition subsequent and not to an automatic termination Zeigler claims that the lease is of the "drill or pay" type. It says this type is in contrast to one that contains an "unless" clause, that is, one in which the lessee's rights are terminated *unless* production is begun. A "drill or pay" provision requires the lessee to produce or, as an alternative, to pay rent. A provision of this type allows the lessee to pay rents as a device to keep the lease in effect though the primary period has expired. (See *Fremont Lumber Co. v. Starrell Petroleum Co.* (1961), 228 Or. 180, 364 P.2d 773; 2 W. Summers, Oil and Gas secs. 331 through 351 (1959); H. Williams, Oil and Gas secs. 601.5, 605 (1977).) A breach of either the provision to drill or to

pay rent will not terminate the lease automatically but is considered to add a condition subsequent to the lease, thus requiring the lessor to take affirmative action in order to terminate the lessee's rights. In the lease here the only covenants pertaining to rent are those requiring payment of the annual rental fee, which is to be credited against any subsequent royalty payments made during that year. This, however, plainly does not allow the payment of rent as a device to extend the duration of the lease beyond the term of 25 years.

Responding to the plaintiffs' argument that Zeigler had an implied obligation to produce, the defendant says that that obligation was satisfied when mining operations were begun on adjacent lands shortly after the lease was entered into. This met, the defendant says, any requirement that production begin within 25 years. To support this contention the defendant cites language of the habendum clause which grants the lessee a right "to mine and remove all of the coal in and under the above described leased lands *and other lands in the vicinity thereof,* or included in *the block of leased coal* hereinafter referred to ***." (Emphasis added.) By specifically referring to lands in the "vicinity" or in the "block of leased coal," the defendant argues that once production began on the plaintiffs' 40 acres or in lands surrounding this property the implied covenant to produce within the term of 25 years would be satisfied. That would permit, it says, the continuation of mining operations for an indefinite time, or, as here, until all the plaintiffs' coal was mined.

In essence, the defendant seeks to have this clause of the lease regarded as a unitization or pooling agreement. In *Southland Royalty Co. v. Humble Oil & Refining Co.* (1952), 151 Tex. 324, 328-29, 249 S.W.2d 914, 916, such agreements were described:

"Some of the legal consequences of a unitized lease as between the lessors on the one hand and

the lessees on the other, in the absence of express agreement to the contrary, are as follows: the life of the lease is extended as to all included tracts beyond the primary term and for as long as oil, gas or other minerals are produced from any one of the tracts included in the lease; the commencement of a well on any one of the tracts operates to excuse the payment of delay rentals on all included tracts for the period stated in the lease; production from a well on any one of the tracts relieves the obligation to pay delay rentals, during production, on all included tracts; *the lessee is relieved of the usual obligation of an implied covenant for reasonable development of each tract separately* \*\*\*. As between the lessors themselves, each relinquishes his right to have his own tract separately developed \*\*\*. *In short, the parties by the execution of a unitized lease agree that production of oil or gas from wells located on any tract included in the lease will be regarded during the life of the lease as production from each and all other tracts included therein.*" (Emphasis added.)

See also 1 R. Myers, Pooling and Unitization secs. 3.01 through 3.03 (2d ed. 1967); L. Hoffman, Voluntary Pooling and Unitization (1954).

These agreements are found more frequently in oil and gas leases where the risks of drainage and wastes onto contiguous lands are greater, but similar provisions do appear in coal leases. (See G. Stroud, *Acquisition of Coal Rights— It's Different,* 21 Rocky Mtn. Min. L. Inst. 587, 600 (1976).) There is, however, no language in the lease to support Zeigler's assertion that the entire bed of coal in the general area, known as the Murdock Mine, was to be deemed a contiguous unit so that production on one or more parcels of land would satisfy the implied agreement to produce with respect to all of the other leased tracts,

regardless of whether or not operations on the other tracts commenced within the primary period.

The only land described in the lease is the plaintiffs' tract. There are vague references to "block" and "vicinity," but the agreement has no language making rights and duties under the instrument depend upon mining operations on other tracts leased by Zeigler. Any want of explicitness of language is attributable to the defendant, unquestionably the drafter of the leasing instrument. We also observe that at the time the leasing agreement was executed the defendant's predecessor in interest had already sunk a mining shaft in a nearby tract of land and thus it appeared that production was imminent. If the parties had intended that removal of coal on other parcels extending over the coal of the Murdock Mines would satisfy production performance owed to the lessors, there would hardly be reason to have provided for a primary term of 25 years in the lease.

The next issue we consider is the question of the proper measure of damages. In addressing this we must first determine whether the trial court erred, as the defendant argues it did, in holding that the defendant was a bad-faith trespasser as a matter of law. The appellate court concluded that this question should have been submitted to the jury and entered a remittitur, it said, to avoid the necessity of remanding for a new trial. To distinguish here between a good- and bad-faith trespasser is important because of the bearing the difference in status has upon the amount of damages to which the plaintiffs are entitled.

When the trial court held that Zeigler was a bad-faith trespasser it had already determined as a matter of law that it was liable to the plaintiffs, based upon the court's earlier conclusion that the lease had expired by its own terms on June 20, 1970. The next question for the court was to decide the proper measure of damages. Courts have distinguished between innocent and wilful trespass as to

damages recoverable. Broadly speaking, most jurisdictions hold that one who in good faith trespasses and converts the coal for his own use may set off certain operating expenses against the value of the coal converted, whereas a wilful trespasser may not and thus becomes liable for the coal at its market value. See Annot., 7 A.L.R. 908 (1920); Annot., 21 A.L.R.2d 380 (1952).

The refusal to allow these setoffs for labor and operational expenses has been held to be punitive in nature. (See 4 American Law of Mining sec. 21.10 (1979) and cases cited therein). Thus, while generally the measure of damages is a jury question, the issue of whether the circumstances in a particular case warrant the imposition of punitive damages is a question of law for the court. (*Kelsay v. Motorola, Inc.* (1978), 74 Ill. 2d 172, citing *Knierim v. Izzo* (1961), 22 Ill. 2d 73; *Queen v. Behm* (1978), 58 Ill. App. 3d 253.) The trial court here did not err in treating the question whether the defendant was a trespasser in good or bad faith as a question of law.

Further, the trial court was correct in its ruling that Zeigler was a wilful trespasser as a matter of law. The record shows that in 1971 the defendant was given actual notice that the Dethloffs were the new owners of the tract in question. Upon tendering the rental payment for 1971 to the plaintiffs it was informed by the Dethloffs that they considered the lease to have expired by its own terms on June 20, 1970, but they also expressed through their attorney a willingness to renegotiate the lease. This and other efforts to renegotiate the terms of a lease were rejected by the defendant. Mr. Dethloff later became aware that Zeigler was to commence operations in the fall of 1975 or later that spring, and he again wrote to the defendant stating that the lease had expired. After production had in fact begun in January of 1976 the plaintiff threatened suit unless operations were halted. Despite the fact that the Dethloffs filed their suit in June of 1976, five

months after Zeigler began removing coal from the plaintiffs' land, the defendant continued to mine until all of the coal in the tract had been removed in December of that year.

At no time did the company attempt to renegotiate the lease, nor did it seek a determination of the parties' rights under the lease by filing a declaratory judgment or other action. The only stated defense for the company's going ahead with mining operations despite its actual notice of the plaintiffs' interest in the land and their position that the lease had expired was a claimed reliance upon legal counsel's advice that the lease was still in effect. That claim on this record is unpersuasive. For example, it was clear to the defendant that a dispute had formally arisen as to its and the plaintiffs' rights. The lease provided that in the event of such a dispute the defendant, as the lessee, had authority to withhold payment of rents. Here the defendant did withhold on the ground that there was a dispute. Despite this acknowledgment of a dispute as to its rights, and in disregard of the plaintiffs' efforts to renegotiate, the defendant went ahead with its mining operations.

Considering our holding that the defendant was correctly judged a wilful trespasser the question next is whether the jury applied the proper measure of damages in awarding the plaintiffs $4,019,867.08. This amount was calculated by multiplying the value of the coal at the mouth of the mine, less lifting costs, by the total tonnage of coal and other materials removed from the plaintiffs' land between January and December of 1976. This formula, except for the erroneously included factor of "other materials," represents the measure of damages uniformly applied in coal conversion cases in Illinois prior to this court's ruling in *Lambach v. Town of Mason* (1944), 386 Ill. 41. Decisions prior to *Lambach* held that regardless of whether the defendant was an innocent or wilful trespasser the measure of damages was to be the

value of the coal at the mouth of the mine, less the costs of conveyance or lifting to that site. See, *e.g., DeGrasse v. H.W. Gossard Co.* (1908), 236 Ill. 73; *Donovan v. Consolidated Coal Co.* (1900), 187 Ill. 28; *Illinois & St. Louis Railroad & Coal Co. v. Ogle* (1879), 92 Ill. 353.

Relying primarily upon *Guffey v. Smith* (1915), 237 U.S. 101, 59 L. Ed. 856, 35 S. Ct. 526, this court, in *Lambach,* held for the first time that a good-faith trespasser should not be held to the same rule on damages as one who wilfully trespasses and converts. The court said that the defendant, who had mistakenly sunk an oil well on the plaintiff's land, should receive "credit for the reasonable cost and expenses of drilling, completing, equipping and operating the well and producing the oil which has been recovered therefrom, less the reasonable value of any of the equipment salvaged." (386 Ill. 41, 56.) *Lambach* involved a trespass in good faith and is not relevant here. The court, in a *dictum,* referred to decisions prohibiting relief to bad-faith trespassers, but we need not here consider the reach of the *dictum.* The rule that, prior to *Lambach,* was applied to both innocent and wilful trespassers was applicable here to the bad-faith trespasser, that is, the measure of damages was the value of the coal at the mouth of the mine, less the lifting costs from the coal bed to that location. In other words, the only production expenses allowed the bad-faith trespasser as an offset are the expenses of conveying or "lifting" the mined coal to the mouth of the mine. The other costs of production, such as of drilling and processing the coal, must be borne by the trespasser.

As we stated, the multiplier figure used for the total amount of coal mined erroneously represented not only the coal which was actually sold but also other materials, such as slag, which had no value and were not marketed for sale. The plaintiff would have been entitled to royalty payments only for coal actually sold, and the nonsaleable

materials should have been excluded. Of the 238,426 tons of material removed, the record shows that the amount of marketable coal was 215,247.40 tons. Upon recalculation from the evidence in the record, the correct measure of damages was the market value of the coal at the mouth of the mine, *i.e.,* the value received upon sale, at $17.91 per ton, minus lifting costs of $1.05 per ton multiplied by 215,247.40 tons of coal sold, or $3,629,070.12. There is no dispute between the parties as to the figures used in these calculations.

The defendant contends that this measure of damages or compensatory formula for landowners is archaic and does not reflect economic reality. The defendant in effect would have us eliminate the distinction drawn between innocent and wilful trespassers so far as recoverable damages are concerned. We consider that the elimination of this distinction would be unsound. The rationale of refusing to allow a wilful trespasser to deduct costs of production when damages are being assessed is, of course, to discourage misconduct of that character. Courts have considered that the discouragement of these trespasses calls for what amounts to awards for punitive damages. As the court in *Athens & Pomeroy Coal & Land Co. v. Tracy* (1925), 22 Ohio App. 21, 33-34, 153 N.E. 240, 244, *aff'd* (1926), 115 Ohio St. 298, 152 N.E. 64, observed:

> "The difference in the measure of damages allowed for an innocent and a wilful conversion lies in public policy. As a strict matter of right *inter partes,* the just claims of one wronged by an unlawful conversion of his goods are satisfied when such owner is fully compensated therefor. If the owner, however, were to be limited to compensation, there would be no inducement for the *** conversioner to refrain from the trespass. *** [This principle] is nothing more or less than the

application of a fixed rule for exemplary damages imposed as a matter of public policy."

It is this rationale that causes us to reject the defendant's proposal that damages should be awarded the plaintiffs according to the royalty method of valuation. Under this formulation the plaintiffs would be entitled to a royalty payment of $.15 per ton, which represents, the defendant says, the current price being paid in the area by coal companies in leasing agreements. The Dethloffs' total compensation or damages according to this standard would be $32,287.11. To apply this artificial standard arbitrarily would obviously allow the defendant to profit by its own wrongdoing. We observe that decisions where this measure was applied involved innocent and not bad-faith trespassers. See, *e.g., McIntosh v. Ropp* (1912), 233 Pa. 497, 82 A. 949; *New Domain Oil & Gas Co. v. McKinney* (1920), 188 Ky. 183, 221 S.W. 245.

There is no merit to the defendant's contention that the plaintiffs were estopped from bringing their action because they failed to take any steps to prevent the defendant from commencing operations. The Dethloffs' cause of action for trespass and conversion did not arise until January of 1976, when production operations began. Suit was brought five months later. The fact that Zeigler tendered a rental payment in October of 1971 did not require the plaintiffs to file suit, nor did this attempted payment mean that mining operations were imminent, which operations in fact did not begin until more than four years later. Too, the contention that the plaintiffs' acceptance of checks representing royalty payments effected an accord and satisfaction does not persuade. None of the checks were cashed; they were retained in a safety deposit box by the plaintiffs only as evidence of the total number of tons of coal mined.

Also without substance is the defendant's claim that the trial court's denial of its motion for a change of venue was improper. The motion was presented when the court

had already held in favor of the plaintiffs on count III, ruling that the lease had expired by its own terms. Since the trial court had ruled on a substantial issue prior to the motion, its denial was proper. See *Gilliland v. Board of Education* (1977), 67 Ill. 2d 143; Ill. Rev. Stat. 1979, ch. 110, par. 503.

Turning to a contention of the plaintiffs, we hold that the trial court was correct in denying their claim that punitive damages were warranted. As we have observed above, the harsh rule on damages applicable to a wilful trespasser and converter of coal is by its very nature punitive. The plaintiffs were awarded damages far beyond what they would have received through royalty payments, and the defendant should not be liable for what would be in effect punitive damages upon punitive damages.

Under the disposition we make it will not be necessary for us to consider the propriety of the appellate court's use of the remittitur. See Ill. Rev. Stat. 1979, ch. 110A, par. 366; see generally C. McCormick, Damages, ch. 2, sec. 19 (1935).

For the reasons given, the judgments of the appellate and circuit courts are affirmed as to liability and reversed as to damages. The cause is remanded to the circuit court of Douglas County with directions to amend its judgment to reflect damages in the amount of $3,629,070.12.

*Appellate court affirmed in part and reversed in part; circuit court affirmed in part and reversed in part; cause remanded, with directions.*

MR. JUSTICE CLARK took no part in the consideration or decision of this case.

MR. JUSTICE UNDERWOOD, concurring in part and dissenting in part:

I agree that the lease had terminated. In my opinion, however, the appellate court correctly held the trial court

should have submitted to the jury the question whether defendant was a good- or bad-faith trespasser. The company had not acted completely arbitrarily in proceeding to mine the coal; it had consulted both its house counsel and independent counsel, and both had advised that the lease was still in effect; defendant apparently knew that similar suits against it by other plaintiffs in the same county had been dismissed by the plaintiffs; and the company had reached the point in its mining operations where it either had to mine plaintiff's coal or permanently bypass it. In these circumstances, I simply cannot say that defendant's bad faith has been so conclusively demonstrated that the issue should have been taken from the jury.

I agree, too, with the remedy fashioned by the appellate court in the form of a remittitur in lieu of a new trial. That remittitur left plaintiffs with a judgment for the total profit realized by the company and was in an amount approximately 50 times greater than the new lease, which plaintiffs were apparently willing to negotiate, would have produced.

MR. JUSTICE RYAN joins in this partial concurrence and partial dissent.